292 So.2d 310 (1974)
SOUTHERN EXCAVATION, INC., Plaintiff-Appellant,
v.
DEPARTMENT OF HIGHWAYS, State of Louisiana, Defendant-Appellee.
No. 9667.
Court of Appeal of Louisiana, First Circuit.
February 11, 1974.
LeDoux R. Provosty, Jr., Alexandria, for plaintiff-appellant.
Marshall W. Wroten, Baton Rouge, for defendant-appellee.
Before LANDRY, ELLIS and PICKETT, JJ.
PICKETT, Judge.
This is an action for breach of contract brought by the contractor, Southern Excavation, Inc., against the State Department of Highways. The basis of the claim is a work stoppage ordered by the Department of Highways, when certain soil conditions were discovered to be wet and unstable. Examinations were made and adjustments in the contract specifications were effected to solve the problem. The contractor in this suit seeks to recover rentals and salaries for its employees during the period of the stoppage when they could not be used.
*311 The trial judge found that the conditions were unforeseen, that the Department's engineer was empowered by the contract to stop work under the circumstances that existed and that the contractor was not entitled to damages for the delay. The contractor has appealed from the judgment dismissing the suit.
The Trial Judge has favored us with admirable written reasons for judgment. Since our review of the record convinces us that his findings and conclusions are correct, we adopt the Trial Court's reasons as our own opinion:
"Plaintiff, Southern Excavation, Inc. (Southern), who contracted with the Louisiana Department of Highways (Department), defendant herein, to be the contractor for construction of approaches to the Red River Bridge in Bossier and Caddo Parishes, seeks to recover alleged losses consisting of the rental value of certain equipment and the salaries of certain employees allegedly idled by a work stoppage instigated by the Department.
Cessation of `earthwork' operations being performed by Southern was ordered by the Department effective Thursday, June 1, 1972. During the previous day, Wednesday, May 31, 1972, a meeting of officials of the Department and Southern had taken place on the job site during which an inspection was conducted of soil problems which had been encountered there. Southern had been engaged in soil excavation operations. The level or depth to which said excavation was to occur was referred to as the Plan `subgrade,' and Southern had been cutting to grade. The soil was in a very wet, saturated condition and the `subgrade' soil was unstable, causing Southern's equipment to sink and become bogged. This soil problem had been noted by the Department's Project Engineer, Hugh R. Pearson, on Friday, May 26, 1972, in his project diary (Defendant's Exhibit D-1), and on Monday, May 29, 1972, Southern was advised by the Department to remove excavation only to plan subgrade until further notice. Then, at the meeting held on the site on Wednesday, May 31, 1972, the Department decided to suspend further earthwork excavation (said suspension to begin Thursday, June 1, 1972) so that it could determine the increased quantities of materials to be excavated and the additional costs involved. Soil borings were to be made to determine the necessary depth of `undercutting' (cutting below plan grade). The process entails removal of the unstable soil and `backfilling' with approved materials. This procedure is provided for in Section 203.08 of the October, 1966 edition of the Department's `Standard Specifications for Roads and Bridges,' referred to as the `Gray Book,' which was incorporated into and formed part of the contract between the Department and Southern. On Thursday, June 1, 1972, and Friday, June 2, 1972, the soil borings were made. Analysis of the findings began on Monday, June 5, 1972, and a report of the results was duly made to the Project Engineer. By Friday, June 9, 1972, all determinations as to quantities and costs had been finalized and a `Plan Change and Special Agreement No. 2 (Rev.)' was accordingly made between the parties on Friday, June 9, 1972 with work being resumed on Monday, June 12, 1972. It is not disputed that weekends were not considered work days on this project. Thus, the suspension of work lasted seven (7) work days: June 1, 2, 5, 6, 7, 8 and 9, 1972.
Southern claims that the delay was caused solely by the Department and unnecessarily so since it was obvious that undercutting was necessary. Further, Southern says that it was at all times ready, willing and able to perform the contract in accordance with its terms and specifications and that it was prevented from doing so solely by the Department.
The Department alleges that it did not cause the delay and that it had no greater ability than Southern to foresee how subsurface conditions would turn out or how such would affect costs. The Department further says that no soil tests had been *312 previously made by it and that Southern never requested the Department to make any subsurface cores. This was attested to by Jarvis Poche, a Department civil engineer who made the soil borings on June 1 and 2, 1972. Therefore, the Department maintains that the soil problem was unforeseen and, as a consequence, the delay unavoidable.
Southern seeks damages occasioned by an alleged breach of contract by the Department. It is incumbent upon Southern to prove the alleged breach of contract; the burden of proof rests with the party alleging the breach.
There is no evidence that the Department had a duty to make soil tests previous to the time that they were taken. Neither is there any evidence that Southern ever requested the Department to perform any soil tests. The Court agrees with the Department that the Department would have owed a duty to Southern to truthfully report to it any test reports prepared by the Department had such information been available. However, no tests were made prior to June 1 and 2, 1972. Therefore, the soil problem which developed was unexpected and unforeseen by both parties and no duty of the Department to anticipate such problem has been shown to exist.
Southern's assertion that it was at all times ready, willing and able to perform the contract in accordance with its terms and specifications is refused by testimony that Southern was unable to continue its operations because of the saturated condition of the soil. Mr. Pearson, the project engineer, was of the opinion that the problem was substantially affected by the large size and heavy weight of Southern's equipment. The Department says that choice of equipment is left to the contractor.
Therefore, the parties were faced with soil problems which were unforeseen and which caused nonperformance of the contract in accordance with its terms. Southern says that it was obvious that undercutting was necessary and that the delay was therefore unnecessary. However, even though the process of `undercutting' is provided for in the Gray Book, the decision to undercut entailed divergence from the original contract in the quantities of two items in the contract: Item 203(1), unclassified excavation, and Item 203(5), special borrow excavation (Joint Exhibit 1). These quantitative changes necessitated a plan change which was enacted on June 9, 1972.
In light of the foregoing, did the Department's decision to suspend work as a result of encountering unforeseen soil conditions, said work stoppage lasting seven (7) work days, amount to a breach of its contract with Southern such as to render it liable to Southern for any delay damages Southern might have suffered?
Section 105.01 of the Gray Book gives the Department's engineer the authority to decide all questions as to the rate of progress of the work and the authority to suspend the work wholly or in part for certain causes:
`105.01 AUTHORITY OF THE ENGINEER. The engineer will decide all questions which may arise as to the quality and acceptability of materials furnished and work performed and as to the rate of progress of the work; all questions which may arise as to the interpretation of the plans and specifications; all questions as to the acceptable fulfillment of the contract on the part of the contractor.

`The engineer will have the authority to suspend the work wholly or in part due to the failure of the contractor to correct conditions unsafe for the workmen or the general public; for failure to carry out provisions of the contract; for failure to carry out orders; for such periods as he may deem necessary due to unsuitable weather; for conditions considered unsuitable for the prosecution of the work or for any other condition or *313 reason deemed to be in the public interest.' (Emphasis Added)
The above section clearly and unequivocally gives the Department engineer the contractual right to suspend work for the causes herein asserted. Surely, unforeseen soil problems qualifies as `conditions considered unsuitable for the prosecution of the work.' Additionally, the Court feels that suspension of the work to allow soil borings to be made to determine variances in quantities of certain contractual items and the costs thereof in order to facilitate a contractual plan change so that the work contracted for could be continued and completed to give effect to the true intent of the parties as determined by the words of the contract between them suffices as a `condition or reason deemed to be in the public interest.' It is the Court's opinion that the decision to suspend the earthwork excavation of Southern was not a breach of contract. It is undisputed that no `contract days' were charged against Southern by the Department during the seven (7) day work stoppage.
Section 104.02 of the Gray Book provides, in part, for procedures to be followed when `unforeseen conditions' are encountered during the progress of the work. First, the engineer `shall' be promptly notified, in writing, of such unforeseen conditions before they are disturbed. Then:
`The engineer will, thereupon, promptly investigate the conditions and, if he finds they do so materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified accordingly.'
This procedure was followed and the result was the plan change of Friday, June 9, 1972. The only question is whether the period of suspension, seven (7) work days, falls within the contractual command to `promptly investigate' and make contractual modifications.
Work was ordered stopped by the Department beginning Thursday, June 1, 1972. Soil borings were made on June 1 and 2, 1972. June 3 and 4, 1972, was a weekend. During the next five (5) work days, June 5-9, analyses of the soil borings were made and reported on to the project engineer. From these findings the Department determined the quantitative changes necessary and the costs involved. The Department and Southern then were able to formulate a plan change, as previously discussed, which was consummated on Friday, June 9, 1972. Work restarted on Monday, June 12, 1972. Jarvis Poche, the Department engineer who made the soil tests and analysis thereon testified that there was no delay in furnishing the information to the project engineer.
Considering the above, the Court finds that the investigation by the Department was promptly carried out with appropriate dispatch and that the resultant contractual plan change was entered into without any unnecessary delay.
The Court, therefore, finds that the decision by the Department to suspend the earthwork operations of Southern was contractually provided for and that the contractual procedures to be followed following such a suspension were promptly carried out by the Department. The Department did not breach its contract with Southern and Southern has failed its burden to prove such breach.
Finding as it does, it is unnecessary for the Court to rule on the Department's contention that Section 105.17 (providing for waiver of any claim by a contractor for any additional compensation for work or material not clearly covered in the contract or not ordered by the engineer as extra work if written notice of intention to make such claim is not given the engineer before beginning the work on which the claim is based) is an exculpatory clause releasing it from any liability because written notice of Southern's claim was received after all *314 work was completed. Such contention is now moot."
For the above and foregoing, the judgment of the Trial Court is affirmed, at plaintiff-appellant's costs.
Affirmed.