(52 South. 487.)

No. 17,773.

LOWER TERREBONNE REFINING & MFG. CO. v. BARROW.

(March 28, 1910. Rehearing Denied May 24, 1910.)

(Syllabus by the Court.)

1. CONTRACTS (§ 143*)—CONSTRUCTION AS A WHOLE—LANGUAGE.

A contract should not be so interpreted as to defeat the main purpose, indicated by its provisions, taken as a whole, or to impute to the parties the use of language without meaning or effect.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 723; Dec. Dig. § 143.*]

2. EVIDENCE (§ 586*)—WEIGHT OF EVIDENCE.

Affirmative testimony, supported by corroborating circumstances, is more convincing than the negative testimony of one who does not remember.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2432–2435; Dec. Dig. § 586.*]

Appeal from Twentieth Judicial District Court, Parish of Terrebonne; W. P. Martin, Judge.

Action by the Lower Terrebonne Refining & Manufacturing Company against R. R. Barrow. Judgment for defendant, and plaintiff appeals. Affirmed.

Suthon & Wurzlow, for appellant. H. S. Gagné, for appellee.

Statement of the Case.

MONROE, J. This case has been thoroughly considered and correctly determined by the learned judge of the district court, and we cannot do better than adopt his opinion (save in one particular, which will be noted) and affirm his decree. The particular to which we refer is this: Under the contract sued on, plaintiff agreed to dig, or dredge out, a certain extension of a canal, belonging to defendant, at an estimated cost of $3,500, in consideration whereof defendant accorded plaintiff the privilege of carrying its freight and the freight of Ashland Plantation (belonging to another concern, but of which one of the parties interested in the plaintiff company was part owner) through the canal, at certain special rates of toll, and agreed that the tolls debited to plaintiff should go in reimbursement of the $3,500 to be expended by it, until the accounts should balance each other, provided that plaintiff should make shipments enough to accomplish that result within three years; otherwise plaintiff's obligation to reimburse the $3,500 to be considered canceled. There was no stipulation in the contract that the tolls due upon the shipments of Ashland Plantation

should be thus dealt with, and, though our learned Brother of the district court says, at one place in his opinion, "Under the terms of the contract, the plaintiff had the right to receive credit for tolls on its own freight and that of Ashland Plantation," he reached a different conclusion before entering his judgment, and, in effect, decided that plaintiff did not have that right. His opinion reads as follows:

Opinion rendered in this case by Hon. W. P. Martin, judge of the district court:

"The plaintiff institutes this suit to recover of the defendant the sum of $3,096.21, on a written contract, under the terms of which the plaintiff alleges that it was agreed that the plaintiff should do a certain amount of dredging, in the canal of defendant, with its dredgeboat, and that no charge should be made for the use of the dredge, but that the defendant should pay, or refund, to the plaintiff, the expense of operating the dredge, including the necessary repairs, provided that the dredging done did not exceed the sum of $3,500.

"That this amount was to be paid, or refunded, by permitting the plaintiff to ship its freight and that of Ashland Plantation through the canal at the rates set forth in said contract; it being stipulated that plaintiff was to keep an exact account of the expenditures for cutting the canal, and the defendant was to keep an account of the amount of freight shipped through the said canal, which was to be credited to the amount due the plaintiff for work and dredging done in the said canal.

"That it was further stipulated in the said contract that the plaintiff was to have three years, from notice that the said canal was open for business, in which to ship a sufficient amount of freight to cover $3,500 expended in dredging.

"Plaintiff then avers that it fulfilled its portion of the contract by cutting the said canal, and, in so doing, expended $3,949.43, a detailed statement of which was rendered the defendant. That the said defendant, thereupon, paid plaintiff, on January 6, 1906, the excess over $3,500 expended by it in the digging of the said canal; that is to say, $449.43.

"That having, on November 29, 1905, received notice from the defendant that his canal was open and ready for business, it proceeded to ship its sugar and molasses through the said canal and to receive freight from New Orleans in the same manner, and that, within the three years, it shipped and received an amount of freight, which, under the tolls stipulated in the contract, was more than sufficient to cover the $3,500 due for work done by its dredgeboat in defendant's canal. That the said defendant paid plaintiff $403.79 for freight on 11,537

barrels of sugar, shipped through the said canal, at the rate of 3½ cents per barrel, leaving, however, a balance of $3,096.21 still due and unpaid, which plaintiff prays to recover.

"The defendant, Barrow, first pleaded the general issue, admitting, however, the contract sued on.

"The defendant sets forth a history of the Barataria & Lafourche Canal, dwelling upon the magnitude of the work which its opening to navigation involved, and also sets forth the causes and inducements which led him to enter into the contract sued on, as well as certain negotiations and agreements had with the plaintiff previous to the signing of the said contract, all of which, being irrelevant to the issue involved, makes it unnecessary to here consider those unnecessary averments.

"The defendant then avers that the contract sued on contemplated the building of barges by the plaintiff, for the purpose of shipping and receiving its freight in the manner and for the tolls set forth in the contract.

"That, after the said contract was completed, in November, 1905, the defendant, finding that the plaintiff was not shipping its freight through the said canal as per agreement, went to Mr. H. G. Bush, the then secretary and treasurer of the plaintiff corporation, and inquired of him the reason why his freight was not being shipped through the said canal. Mr. Bush having stated that he found it impossible to build barges in time to market the crop of 1905 and 1906, he, therefore (in order to encourage Capt. Bradford, who was operating a boat in the said canal), agreed with Mr. Bush that, if he would ship the crop of 1905 by the boat of Capt. Bradford, he (defendant) would allow the plaintiff, on all freight so shipped, for that season, the same refund of tolls as was provided in the written contract. That, notwithstanding this inducement, the plaintiff shipped but a small portion of its crop of 1905 through the said canal, by Capt. Bradford, and, since then, it has not shipped any freight at all through the canal.

"That, according to his agreement, the defendant refunded to the plaintiff the tolls collected upon freights shipped by Capt. Bradford during the season of 1905. That the said agreement was only for the season of 1905, and that, although the crops of 1906-1907-1908 have, since, been marketed by plaintiff, it failed to transport its freight through the defendant's canal in the manner contemplated by the contract, but has shipped the same by rail.

"After making certain averments in regard to certain agreements between plaintiff and the railroad company, in regard to freight, which averments were stricken from defendant's answer, previous to trial, the defendant, finally, avers that the plaintiff, having failed to ship its freight through his canal, as contemplated in the contract, and the time having elapsed in which the plaintiff enjoyed the right to ship its freight under the terms and inducements

set forth in its contract, so much of the money as was expended by plaintiff in tolls has, ipso facto, been forfeited by defendant.

"Reserving his right to sue the plaintiff for the violation of its contract, the defendant finally prays to be dismissed, with costs.

"Opinion.

"The solution of the issues involved in this case depends upon the interpretation of the contract sued on. The contract is divided into four sections, the first of which presents no difficulties; it being admitted that plaintiff carried out its obligation, and that the statement rendered, showing the amount expended by plaintiff in digging the canal, is correct.

"This statement shows that the plaintiff expended $3,949.43 in doing this work, and, in order to reduce the indebtedness to the amount set forth in the contract, to wit, $3,500, the defendant remitted to plaintiff his check for $449.43.

"The second section relates to special rates of toll allowed the plaintiff, in connection with the work performed by it in dredging the said canal, and the manner in which the shipments of freight should be made and the tolls ascertained. This section of the contract reads as follows:

" 'That, in consideration of doing this work, the party of the second part is to enjoy the right to have its freights, and the freights of Ashland Plantation, of Caillouet and Maginnis, pass through the said canal its entire length, from Bayou Terrebonne to the Mississippi river, at the following rates of toll: When barges of less than 1,000 barrels of sugar capacity are locked, at one time, in one or more barges, the rate is to be 4 cents per barrel, based on the capacity of the barges; when 1,000 or more barrels of sugar are locked at one time, in one or more barges, the rate is to be 3½ cents per barrel, based on the capacity of the barges. All barges of the party of the second part shall be rated at their carrying capacity in barrels of sugar. The rate on all freight, including coal and oil, going back from New Orleans, is to be at 20 cents per ton, of 2,000 pounds, and the party of the second part agrees to furnish exact weights on all back freights from the river end of said canal. Empty barges from New Orleans to be locked free. Empty barges to New Orleans to be locked free, provided, it is intended that freight shall be returned by these same barges, and, in that case, the toll, on the barges returned, shall not be at 20 cents per ton, of 2,000 pounds, but at the carrying capacity of the barges in barrels of sugar and at the rate, as agreed, on sugar coming to New Orleans.'

"Before discussing the evidence in this case, it would be well to thoroughly understand this section of the contract, as the correct interpretation of its provisions solves, to a great extent, the questions and issues involved.

"In granting to the plaintiff the right to ship its freight and that of Ashland Plantation through the defendant's canal, provision is made for the rates of toll and the manner of ascertaining the same. It provides that 'when barges of less than 1,000 barrels of sugar capacity are locked at one time, in one or more barges, the rate is to be 4 cents per barrel, based on the capacity of the barges; when 1,000, or more, barrels of sugar are locked at one time, in one or more barges, the rate is to be 3½ cents per barrel, based on the capacity of the barges.' The very evident meaning of this provision is that the toll charged is not based on the number of barrels of sugar actually contained in the barges locked through the canal, but on the capacity of the barges used in shipping the sugar or other products.

"The capacity of the barges is determined by ascertaining the number of barrels of sugar that the barges will carry. In other words, a barrel of sugar is used as a measurement to ascertain the carrying capacity of the barges, and the rate of toll is charged on the capacity of the barge, and not on the actual freight contained in the barge, whether it be sugar or other product.

"For instance, if the carrying capacity of a barge is less than a thousand barrels, say, 500 barrels, of sugar, the toll would be 4 cents for every barrel of sugar it was capable of carrying; that is to say $20, and this would be the charge irrespective of whether the barge actually contained one barrel of sugar or 500 barrels. If the capacity of the barge exceeded 1,000 barrels of sugar, say, 1,100 barrels, then the toll would be 3½ cents for every barrel of sugar it was capable of carrying; that is to say, $38.50.

"This provision in the contract for ascertaining the tolls to be charged is made clearer by the provision, immediately following, to the effect that: 'All barges of the party of the second part shall be rated at their carrying capacity in barrels of sugar.'

"The very evident purpose of providing for the rating of the carrying capacity of the barges was to ascertain the toll to be charged, and this would be unnecessary if the toll was to be collected on every barrel of sugar contained in the barge. The reason of thus fixing the tolls is self-evident.

"It is as much trouble and as expensive to lock a barge, through a canal, that contains one barrel of sugar, as it is to lock one through containing 500 barrels, and if the toll was fixed on what the barges contained, and not on the capacity, a barge with 500-barrel capacity could be locked through the canal for 4 cents.

"A careful reading of this section of the contract satisfies the court that it was the intent of the parties to the contract that the plaintiff, designated as the party of the second part, should operate its own barges; that is to say, should ship its freight, both to and from its refinery in barges constructed, leased, hired, or employed for the particular purposes of transporting either its freight or that of Ashland Plantation.

"Were it otherwise, why the provision that the toll should be charged on the carrying capac-

ity of the barges used in the transportation of the freight of the plaintiff? And, why the provision that 'all barges of the party of the second part (plaintiff) shall be rated at their carrying capacity'?

"This section of the contract also provides for the toll on freight coming from New Orleans and fixes such toll at 20 cents per ton, and provides, further, that empty barges, to New Orleans, shall go free, provided that it is intended that freight shall be returned by such barges; but, in the latter case, the toll is not 20 cents per ton, but is fixed at the carrying capacity of the barges.

"It is manifest that such a provision as this was not meant to apply to common carriers by whom the plaintiff might have shipped some freight, but was meant to apply to barges used exclusively in carrying plaintiff's freight or that of the Ashland Plantation, and which the contract provides shall be estimated at their carrying capacity, in barrels of sugar.

"Section 3 of the contract makes it even more clear that the contract contemplated the shipping of plaintiff's freight in its own barges or in barges operated for that purpose. This section provides the manner in which the plaintiff shall be credited with its tolls. Neither the payment of any cash nor the refunding of tolls is contemplated by the contract. It is provided that the defendant shall keep an exact account of the tolls charged against the freight of the plaintiff and credit the same against the $3,500 due the plaintiff for its work in the canal, until the same has been liquidated, and the plaintiff is given three years in which to ship a sufficient quantity of freight, the tolls of which would be equal to the indebtedness of the defendant.

"The contract, therefore, did not contemplate the refunding of any tolls, and yet, if the plaintiff were permitted to ship by a common carrier, and pay such carrier its regular charge, it could recover in no other way save that of refunding.

"But the plaintiff contends that the defendant, Barrow, having refunded the amount of freight charges paid by it to a common carrier for the season of 1905, has thereby admitted and shown that he placed the same construction on the contract as did defendant; that is to say, it was in contemplation of the parties that the freight, as paid, be refunded.

"This refunding was done by check, which must be considered in connection with the letter which accompanied the check.

"In this letter, of May 2d, 1906, the defendant, Barrow, in explaining the remittance, states that it is made by virtue of a personal agreement with plaintiff, to the effect that he would refund the toll paid Bradford, a common carrier, for the season of 1905, and that he made that agreement in order to encourage Bradford to go into the business. And, in this same letter, defendant makes some reference to the building of barges by the plaintiff, thereby showing that it was not his understanding that the plaintiff had been released from the contractual obligations to operate its own barges, save and ex-

cept for the season of 1905. In replying to the letter of Barrow, of May 2, 1906, the defendant does not deny the personal agreement referred to in Barrow's letter, but calls his attention to the fact that the amount of the check does not correspond to the tolls of the contract.

"On May 6th, Barrow, in remitting an additional check of $57.68, says: 'Yours of the fourth to hand. In figuring up tolls to be refunded you, I did not have the memo of agreement with me and thought it was three cents, when it should have been three and one-half cents.'

"The plaintiff earnestly contends that this sentence in Barrow's letter is an additional admission on his part that he intended and understood the contract to mean that plaintiff was to get a refund on all freight, it mattered not how shipped.

"This is not the impression conveyed to my mind. This reference in Barrow's letter seems to be made, not to the contract, but to the 'personal agreement' referred to in his first letter to plaintiff.

"Mr. Barrow positively so swears, and what immediately follows this reference in his letter convinces me that he was referring to the personal agreement and not to the contract. The letter goes on to say: 'You will remember that, after I had induced Mr. Bradford, last season, to enter this Terrebonne trade, in order to get you to patronize him by giving your sugar, I said to you. I would be willing to return your tolls on sugar you gave him, at three and one-half cents per barrel, for the season, and back freight would not be considered,' etc.

"From this it will be seen that Barrow, after referring to the 'memo of agreement,' went on to state what the agreement was, stating that the tolls to be refunded for that season were to be at the rate of 3½ cents a barrel; whereas, the written contract stipulated that they should be 3½ cents and 4 cents, according to the capacity of the barges.

"True it is that Mr. H. G. Bush, with whom this personal agreement was made, testified that he had no recollection of any such agreement. This agreement was supposed to have been made in November or December, 1905, and, while Mr. Bush had no recollection of such an agreement, on the trial of this case, and the court here states that it believes that Mr. Bush testified to the best of his recollection, yet his memory seems to have been better on May 4, 1906, because, at that time, in writing to Mr. Barrow, he says: 'We seem to have different ideas in regard to toll on our sugar, and, if the writer remembers correctly, he had a conversation with you last winter in which you stated that our tolls would be allowed no matter who owned the boat or the barges hauling our freight.'

"It would seem, therefore, that Mr. Barrow and Mr. Bush did have some conversation, during the winter of 1905, in reference to the hauling of freight by other means than on barges furnished by the plaintiff; and the plaintiff would seem to admit, in the letter, that, under

the contract, it was obliged to furnish barges, otherwise, why should it refer to a subsequent agreement by which it is claimed that he was given the right to ship by any boat or barge?

"Taking into consideration this reference, in Mr. Bush's letter, to a conversation with Mr. Barrow relative to the tolls that would be allowed the plaintiff when shipping by common carrier, and the fact that Mr. Barrow's recollection of this agreement is clear and positive, both on the day of the trial and on May 2, 1906, when he stated the agreement in his letter, and considering, further, that, in his correspondence at that time, the plaintiff, at no time, denied this agreement, further than to take the position that it was not part of the contract that it should own its boats or barges, I am of the opinion that the personal agreement referred to in Mr. Barrow's letter of May 2, 1906, has been proved by a fair preponderance of evidence.

"But, even though it be admitted that Mr. Barrow, in his letter of May 2, 1906, referred to the written contract, and not the personal agreement, would the plaintiff be in a better position?

"The contract, itself, is clear and explicit, and, by its terms, the plaintiff bound itself to ship its sugar and freight in a certain manner, and it certainly cannot now be held that the contract has changed because the defendant sent a check to the plaintiff, which, without the personal agreement, it was not entitled to.

"To my mind, the conclusion is irresistible that the intent of the parties to the contract was that the plaintiff was to operate is own barges, whether it did so by building, chartering, supplying barges, or otherwise, and that the contract contemplated no refunding of tolls when shipped by a common carrier. The fact that defendant did refund certain tolls during the season of 1905 is shown to have been done by virtue of a subsequent, oral agreement, which did not, in any way, affect or modify the original contract.

"By this subsequent agreement, relative to the season of 1905, the plaintiff was the gainer rather than the loser, as, by it, the plaintiff received tolls not contemplated by the contract and which would, otherwise, have been lost, as it was unprepared, in 1905, to ship its sugar in the manner set forth in the contract.

"The plaintiff had three years in which to make preparations to ship its crop as was contemplated, and the terms of the contract were specifically called to its attention in May, 1906, by Mr. Barrow's letter, so that it had two years and a half in which to make preparations to reimburse itself in tolls for the outlay in operating its dredge in defendant's canal.

"Having failed to ship its sugar and to receive its freight from New Orleans, as set forth in, and contemplated by, the contract, and having permitted the three years' limit to expire, within which it had the right to have liquidated the defendant's indebtedness to it by shipping its sugar in barges operated for that purpose, the plaintiff cannot now force the defendant to pay it, in cash, the unearned portion of the amount still unpaid on its work in the said canal.

"To give the plaintiff a judgment as prayed for would not only be contrary to the letter and spirit of its contract with defendant, but it would be doing a great injury to the defendant.

"It was, and could, not, possibly, be contemplated that the defendant should ascertain from every common carrier whose boats were locked through this canal, whether the defendant had any freight on its boats, and the nature and extent of the same, and yet, if the plaintiff's contention be true, that is what the defendant had to do.

"True, the defendant ascertained the amount of sugar shipped by plaintiff for the season of 1905; but this seems to have been done under some arrangement with Capt. Bradford, and plaintiff had due and timely notice that this arrangement would only hold good for that particular season.

"And, again, of what profit or advantage would it be to the defendant to have a common carrier operating in its canal, if the toll collected on the boats or barges of the carrier had to be remitted to the plaintiff? That would be the equivalent of taking money out of one pocket and placing it in another.

"For the foregoing reasons, it follows that the demand of the plaintiff for the refunding of the tolls paid by it to a common carrier, who was receiving and delivering plaintiff's freight along with that of other persons, must, under the terms of the contract, be rejected.

"This brings us to the consideration of the molasses shipments made by plaintiffs. Those shipments appear to have been made in barges, but it is not shown whether or not they were handled by a common carrier along with other freights. If made in separate barges, capable of being estimated or rated in accordance with the terms of the contract, and the same can be reduced to its equivalent in barrels of sugar, then the plaintiff is entitled to refund on this molasses, because the same was shipped in accordance with the spirit of the contract, and any tolls collected thereon may be recovered. The evidence adduced on this phase of the case is too meager and unsatisfactory to base a judgment on, and, as before stated, such shipments may have been made, along with other freights, on a common carrier.

"The same may be said of the freight of the Ashland Plantation. Under the terms of the contract, the plaintiff had the right to receive credit for the tolls on its own freight and that of the Ashland Plantation of Caillouet & Maginnis, and, if the shipments were made in the manner contemplated in the contract, then the plaintiff is entitled to recover."

In entering the decree, the learned judge nonsuited the plaintiff on its claim for reimbursement of freights paid on molasses, and, finally, rejected its demand in all other

respects, including, necessarily, that relating to the freights from Ashland Plantation.

A careful consideration of the contract sued on and of the evidence adduced has satisfied us of the correctness of the conclusions reached and of the reasons upon which they are based.

The judgment appealed from is accordingly affirmed.