United States Court of Appeals,

Fifth Circuit.

No. 91-9502

(Summary Calendar).

In the Matter of J. Lawrence HILL, Debtor.

David V. ADLER, Appellant,

v.

J. Lawrence HILL and Whitney National Bank, Appellees.

Feb. 4, 1993.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JONES, DUHÉ and WIENER, Circuit Judges.

WIENER, Circuit Judge:

On appeal from the district court's affirmation of a ruling by the bankruptcy court in the Eastern District of Louisiana, Appellant David V. Adler, trustee of the estate of the Debtor, J. Lawrence Hill, complains that those courts misconstrued the Civil Law meaning of the verb, *to hypothecate,* as used in a corporate charter provision purporting to restrict alienation of corporate stock, the purported pledge of which is the subject of the instant litigation. The district court affirmed the bankruptcy court's holding that, although the restriction in question was properly referred to by a legend on the stock certificate representing the stock that the Debtor, J. Lawrence Hill, purportedly pledged to Appellee, Whitney National Bank (the Bank), the act of pledge did not fall within the ambit of the restriction and thus was neither a void nor a voidable transaction. The ruling was grounded on the bankruptcy court's determination that under current Louisiana law the meaning of *to hypothecate* is limited to *mortgage* and does not include the pledge of corporate stock.

Agreeing with Adler's contrary view that in current Louisiana legal parlance, *to hypothecate* may connote *to mortgage* only but may also be synonymous with *to pledge* or *to encumber,* depending on the context, circumstances and manner in which that verb is used, we conclude that the use of "hypothecate" in the stock restriction provision here under consideration must mean *pledge*

or mean nothing at all, the latter being a result not permitted if any sensible meaning can be attributed to a word employed in a writing. We therefore reverse and remand this case to the bankruptcy court for further proceedings consistent with this opinion.

I

FACTS AND PROCEEDINGS

A. *Operable Facts*

The facts on which the bankruptcy court based its rulings were stipulated and are not at issue here. Over time, Hill entered into various loan agreements with the Bank. By early 1988, he owed the Bank in excess of $700,000, and it insisted that he furnish additional collateral. The collateral demanded included Hill's 25 shares of the capital stock of Lucullus, Inc., a closely-held Louisiana business corporation. Hill's shares represent 25% of all issued and outstanding stock of Lucullus. The rest is owned by Patrick J. Dunne (50 shares or 50%) and John A. Pico (25 shares or 25%).

Under date of June 23, 1988, Hill signed a Pledge Agreement on the Bank's standard printed form, purporting to pledge his Lucullus stock to the Bank. He did not endorse his stock certificate, which he deposited with the Bank, but did execute and deliver to the Bank an undated and unwitnessed "Assignment Separate from Certificate," signed in the blank by Hill.

Hill's 25 shares of Lucullus, Inc. is represented by Certificate No. 2. That certificate is registered in the name of J. Lawrence Hill; it bears a reference on its face instructing "See Restrictions on Transfer on Reverse Hereof"; and its reverse side bears the following legend:

> The securities represented by this certificate are subject to restrictions on transferability as set forth in the by-laws (or articles as the case may be) of the corporation. No stock may be transferred *or encumbered* in any fashion without prior compliance with the requirements set forth herein. All persons are referred thereto, a copy of which is on file with the Secretary of this Corporation at the registered office of the corporation, for a full statement of the restrictions on this stock. (emphasis added).

> Article VIII of the Articles of Incorporation of Lucullus, Inc. states, in pertinent part:

> No shareholder shall sell, transfer, *hypothecate,* assign, or in any manner convey his stock without first offering same, in writing through the Board of Directors for a period of thirty (30) days to the remaining shareholders, who shall be notified of such offer at once by the Board of Directors. Within said thirty-day period, the remaining shareholders shall have the right to purchase the stock so offered, at book value as reflected by the books of the corporation as of the end of the month preceding the month in which said stock is first offered for sale. (emphasis added).

Notice of the June 23, 1988, stock pledge by Hill was sent to the corporation by letter dated July 5, 1988, addressed to the attention of Patrick J. Dunne, President. Signed by Julian F. Neill, Vice President of the Bank, that three-sentence letter stated:

> Larry Hill has pledged 25 shares of Lucullus stock to us to secure any indebtedness of his to the bank. This stock is legended so it has to be offered to the company before it is sold to anyone else. At this time we do not plan to dispose of the stock; however, I want you to know that it is pledged to us.

No response from the corporation was requested and none was given.

The record does not reflect additional correspondence among the Bank, the corporation, and the shareholders of Lucullus until November 21, 1989, when counsel for the Bank wrote to the corporation and all three shareholders, notifying them, "pursuant to Article 8 [sic] of the Articles of Incorporation of Lucullus, Inc.," of the Bank's intention to sell the pledged stock. By letter dated November 29, 1989, Dunne as President and a stockholder, and Pico as Secretary-Treasurer and a stockholder, jointly wrote to counsel for the Bank, formally repudiating the validity of Hill's pledge. Additionally, the letter advised counsel that the corporation and the remaining shareholders had a continuing interest in purchasing the stock on the terms provided in Article VIII of the charter and that they desired to cooperate with the Bank for the benefit of their fellow shareholder, Hill. The record does not reflect the book value of Hill's Lucullus stock as of the date he purported to pledge it to the Bank, but the bankruptcy court found, presumably based on a stipulation, that the book value of that stock was $69,347.50 as of March 31, 1990.

On December 1, 1989, two days after the corporation, Dunne and Pico had responded to counsel for the Bank, a state court consent judgment was entered into by the Bank and Hill. That judgment purports to recognize rights of the Bank under the Pledge Agreement of June 23, 1988. Less than two weeks later, on December 12, 1989, Hill filed a Petition for Relief under Chapter 7 of the Bankruptcy Code.

B. *Judicial Proceedings*

Procedurally, this matter first came before the bankruptcy court on the Bank's motion to lift the automatic stay as it applied to Hill's 25 shares of Lucullus stock. In the capacity of trustee, Adler countered by filing an adversary proceeding against the Bank, seeking to have Hill's pledge of June

23, 1988 declared null and void. The bankruptcy court considered the facts stipulated, the memoranda submitted by the parties, the arguments of counsel, and the record in the case, then entered its memorandum opinion, the net result of which was to validate the stock pledge. The bankruptcy court reached that result by holding the charter restriction on hypothecation inapplicable to pledge. The court then superimposed on the Bank an obligation to "comply" with Article VIII of the charter by offering the stock to the shareholders of Lucullus in the event the Bank decides to foreclose the pledge by selling the stock.

Adler appealed the bankruptcy court's ruling to the district court, which made a one sentence minute entry on August 15, 1991, that "[t]he ruling of [the bankruptcy court] is upheld." Thereafter, the district court entered a separate judgment dated November 6, 1991, ordering that the bankruptcy court's ruling "be, and it hereby is, upheld and affirmed." The district court made no independent findings of fact or conclusions of law. Adler timely appealed the district court's affirmance of the bankruptcy court's decision.

## II

## STANDARD OF REVIEW

As the facts found by the bankruptcy court and affirmed without comment by the district court were either stipulated by the parties or based on documentary evidence filed in the record without objection, the standard by which we review the factual findings of the bankruptcy court that reach us following appeal to the district court is of no moment. The only issues before us are legal ones, which we review de novo.

## III

## PRIOR PROCEEDINGS

A. *Bankruptcy Court Opinion*

As a preliminary matter the bankruptcy court found that Adler, as trustee, has standing to bring the adversary complaint under 11 U.S.C. § 544. The court reasoned that even though "[t]he Trustee has no independent power of avoidance, but may act only upon the right of one unsecured creditor holding an allowable claim, against whom the transfer or obligation was invalid under state

law," the claim of John Pico—an unsecured creditor and stockholder in Lucullus who is entitled to claim the benefit of the transfer restriction—supplies the necessary derivative standing.

Having found standing, the bankruptcy court considered whether the restrictions specified in the Articles of Incorporation govern the encumbrance of Lucullus stock. The court found that the stock certificate was properly legended to refer any interested party to the Articles of Incorporation for a full statement of the restrictions on the stock, as required by the Louisiana Business Corporation Law,[1] presumably considering the specific requirements of section 57(F).[2] The court correctly acknowledged that its task was to "interpret Article VIII in order to determine if the pledge was prohibited and therefore void."

After observing that Article VIII's restriction prohibits the holder of Lucullus stock from selling, transferring, hypothecating, assigning, or in any other manner conveying the stock without first offering it to the other shareholders, the bankruptcy court expressed the opinion that "[a]ll these words except "hypothecate' indicate a change in the ownership of the stock." In progressing down what turned out to be a primrose path artfully laid out by able Civilian counsel for the Bank, the court then observed that pledge produces no change in ownership of the encumbered property, so that unless pledge and hypothecate are synonymous, Article VIII would not apply to pledge. In its next step down that path, the court relied on the interpretative rule contained in Louisiana Civil Code article 2047 which directs that "words of art and technical terms must be given their technical meaning when the contract involves a technical matter," concluding that "hypothecate" should be given its technical meaning as a legal term of art. Turning next to *Black's Law Dictionary,* 5th Edition, the court—apparently without being overly impressed—found "hypothecate" defined as "to pledge property as security or collateral for a debt."

After then noting that, even though both pledgors and mortgagors retain *ownership* of the thing encumbered, the pledgee obtains possession while the mortgagee does not, the bankruptcy court stated the following non sequitur:

---

[1] LA.REV.STAT.ANN. §§ 12:1 to 12:178 (West 1950 & Supp. 1992).

[2] LA.REV.STAT.ANN. § 12:57(F) (West 1950).

hypothecate, then, simply means to mortgage. In the case at Bar, there is no question that the pledge was validly confected pursuant to La.C.C. Art. 3158.... Furthermore, the pledged stock has been delivered to [the Bank].

Finally, and perhaps most mysteriously, the bankruptcy court—after reiterating the Louisiana jurisprudential rule that restrictions on the transfer of stock ought to be strictly construed in favor of transferability—concluded:

> Accordingly, after strictly construing the stock restriction at issue, this Court finds that the restriction did not prevent the pledge of the stock to [the Bank]. However, if the stock is sold by [the Bank, the Bank] must first comply with Article VIII and offer the stock to the shareholders of Lucullus.

## B. *Appeal to the District Court*

Adler appealed the ruling of the bankruptcy court to the federal district court pursuant to notice of appeal filed in the bankruptcy court in April, 1991.[3] After completion of briefing by the parties, the case was orally argued to the district court which, in November 1991, affirmed the bankruptcy court's ruling. The district court assigned no reasons for its affirmation, either orally or in writing. When a district court sitting as a court of review furnishes neither reasons nor findings for its decision, this court in essence disregards the legal conclusions of the district court and reviews the findings, reasoning, and judgment of the bankruptcy court directly.

IV

ANALYSIS

## A. *Bankruptcy Issue*

With one exception, the legal issues presented by this appeal are uniquely questions of Louisiana law. The only purely bankruptcy issue concerns the trustee's standing to bring this adversary proceeding to challenge the validity of Hill's pledge of the Lucullus stock in the face of the charter restriction in question. We affirm the analysis and holding of the bankruptcy court that Adler, as trustee, enjoys such standing. Moreover, lest there be some question concerning the legal right of the trustee, standing in the shoes of the Debtor, to contest the validity of a stock pledge which is valid and uncontestable between the parties *inter se,* we note that for such purposes the trustee in

---

[3]*See* 28 U.S.C. § 158 (1988); BANKR.R. 8001 *et seq.*

bankruptcy is accorded the status of a third party.[4]

B. *Louisiana Law Issues*

      This case comprises two clear issues of Louisiana law. One, which turns on the meaning of "hypothecate" as used in the charter of Lucullus, Inc., questions the applicability of the restriction provision of Article VIII to pledge. The other, which turns on provisions of the Louisiana Business Corporation Law, questions the legal effects produced by the actions or inactions of Hill, the Bank, the corporation and the remaining stockholders—and their remedies, if any—if the provisions of Article VIII of the charter of Lucullus, Inc. do apply to pledges of stock in that corporation. We consider these two issues of Louisiana law in inverse order.

1. Restrictions on Alienation of Corporate Stock.

      The jurisprudence of Louisiana reflects over a century of use of restrictions on the alienation of corporate stock.[5] Nevertheless, the efficacy of such restrictions was not expressly recognized by the courts of the state until 1964.[6] Coincidentally, the restriction approbated in that case was, like the one now before us, a right of first refusal.

      This type of restriction has long been recognized as serving valid purposes in closely-held corporations, principal among which are 1) controlling the makeup of the shareholder group, and 2) preventing the stock from falling into the hands of undesirable corporate partners.[7] Even though, as correctly found by the bankruptcy court in the instant case, the courts of Louisiana at least give lip service to the maxim that restrictions on alienation of corporate stock are to be construed narrowly

---

[4]*C.f., e.g., In re SEACO Int'l, Inc.,* 82 B.R. 821 (Bkrtcy.E.D.La.1987).

[5]*See, e.g., Ellison, Creevy & Emley v. Schneider,* 25 La.Ann. 435, 436 (1873); *Byron v. Carter,* 22 La.Ann. 98 (1870).

[6]*Phillips v. Newland,* 166 So.2d 357 (La.Ct.App. 3d Cir.1964).

[7]*See, e.g., Martin v. McCloskey,* 155 La. 604, 99 So. 477, 480 (1924) (The purpose of the first refusal provision was "to guard against the stock getting into the hands of other persons who might "cause trouble.' "); *Crescent City Seltzer & Mineral Water Mfg. v. Deblieux,* 40 La.Ann. 155, 3 So. 726, 727 (1888) (finding that first refusal provision intended to "prevent the disposition of the stock to strangers").

because they impinge on free transferability of corporate ownership,[8] such a position is not universally applauded. It was roundly criticized, for example, by Professor Tom Andre, Jr. of the Tulane University School of Law in his definitive work on the subject[9] as lacking any valid public policy foundation either in the Louisiana Civil Code or other legislation. Professor Andre makes a flawless argument for liberal construction of such restrictions, illustrated with numerous valid business and tax purposes for their use and evenhanded enforcement. Nevertheless, for purposes of the instant case, we follow the dictates of constant Louisiana jurisprudence as it currently stands, and strictly construe Article VIII of the charter of Lucullus, Inc.

Before parsing that charter provision, however, we are constrained to make several observations. First, assuming he can prevail on the issue of the restriction's applicability to the transaction here under litigation, Adler contends that the purported pledge to the Bank by Hill in violation of the restriction is void, i.e., absolutely null. He contends in the alternative, however, that even if the transaction is not absolutely null it is at least voidable, i.e., relatively null. Although we assume without determining that a transfer or encumbrance in violation of such a stock restriction is not an absolute nullity and at least is valid between the parties—after all, it may be waived or ratified by the corporation or the other shareholders—it is sufficient for our purposes that *if* the restriction applies to pledge and *if* Hill's purported pledge to the Bank violates the restriction, relative nullity is all that is required to support Adler's attack on the transaction. Unlike the corporation and the other shareholders, who might have waived, acquiesced in, ratified or otherwise acted (or failed to act) in such a manner as to abrogate their right to attack the purported pledge transaction, the trustee in bankruptcy has standing and acted timely to annul the subject transaction.

Second, we find no support for the secondary holding of the bankruptcy court that, even though the restriction of Article VIII is inapplicable to pledge, the Bank as pledgee is bound to offer the stock to the other shareholders (presumably for book value as specified in Article VIII) before

---

[8] *Goldblum v. Boyd,* 341 So.2d 436, 448-49 (La.Ct.App. 2d Cir.1976).

[9] Thomas J. Andre, Jr., *Restrictions on the Transfer of Shares: A Search for a Public Policy,* 53 TUL.L.REV. 776, 779 (1979).

foreclosing on the pledge by selling the stock. By its own terms the stock restriction applies only to "a shareholder," and the bankruptcy court has already determined, correctly, that pledge does not transfer title. Thus, even if Hill's pledge to the Bank is neither void nor voidable under the transfer restriction, the pledgee Bank is still not a shareholder. Consequently, if we were to conclude that the restrictions of Article VIII do not prohibit pledge, thereby validating Hill's pledge to the Bank, the "first refusal" provisions of Article VIII would be equally inapplicable and would, therefore, impose no duty on the Bank, as a non-shareholder pledgee, to offer the stock to the corporation or the other shareholders. In short, either all features of the charter restriction apply or none does.

Third, we disagree with the bankruptcy court's contention that "hypothecate" is the only type of transaction among those proscribed by Article VIII that is not a title-transferring act. Specifically, the word "hypo thecate" is followed by the word "assign." "Assign" in current legal parlance may signify either a title transferring act or a pignorative act, depending on the context in which that term is used. For example, when a legal document refers to a lessee's assignment of a lease—particularly a mineral lease—the statement usually connotes transfer of title (although it is not unheard of for a mineral lessee to "assign" leasehold interests, particularly future royalties or "runs," to a lending institution or other creditor by way of collateral). Similarly, a lessor may "assign" rents or royalties, whether to a third party purchaser or to a creditor. On the other hand, an assignment under the Louisiana Assignment of Accounts Receivable Law,[10] from the creditor/owner of the receivables to his lender or creditor, is clearly a pignorative transaction with title remaining in the assignor until or unless the underlying obligation secured by such assignment becomes delinquent. In each instance, then, the context must be considered before making a determination whether the parties intend for the assignor of the lease to transfer title or merely to encumber his or her lease or leasehold interest.

The point we make is not that Hill might be found to have "assigned" his stock to the Bank in some sort of secured transaction; clearly, the transaction attempted was pledge if it was anything. Rather, the point we make is that "assign," as used in the Lucullus charter restriction, does not necessarily refer exclusively to a title-transferring transaction—if it refers to such a transaction at all.

---

[10]LA.REV.STAT.ANN. § 9:3101 *et seq.*

Like hypothecate, one of the meanings of "assign" in Article VIII could well be that of collateral assignment. As such, the use of "hypothecate, assign" in the proscription sentence of Article VIII could support an interpretation, under the doctrine of *ejusdem generis,* that would encompass any recognized method of encumbering corporate stock—pledge being preeminent among such encumbrances known to the law of Louisiana.

But, as explained more fully below, we need not explore such an interpretative process. At this juncture, it suffices that Adler as trustee in bankruptcy would be entitled to a judgment nullifying Hill's purported pledge of his Lucullus stock to the Bank *if,* in the context employed in Article VIII of the corporate charter, "hypothecate" is found to be synonymous with "pledge." And if that should turn out to be the case, the uncontested facts confirm beyond peradventure that Hill made no effort to comply with the prerequisite for encumbering his stock—offering that stock to his fellow shareholders at book value for a period of thirty days—and that the Bank did not require such compliance despite its conceded knowledge of the legend and restriction. We turn, therefore, to the meaning of "hypothecate."

2. The Meaning of Hypothecate in Article VIII

We have already noted, as did the bankruptcy court, that the leading law dictionary defines *to hypothecate* as *to pledge.*[11] Strong support for that definition is found in the leading dictionary of the English language[12] as well. But the bankruptcy court did not stop with dictionary definitions, and neither do we. A brief review of the centuries long history of the term reveals that, when used as a verb, hypothecate is sometimes expansive, denoting both pledge and mortgage, while at other times it is narrow, denoting only mortgage.[13] We look next to the history of the term.

---

[11]BLACK'S LAW DICTIONARY 742 (6th ed. 1990).

[12]"Hypothecate ... [t]o give or pledge as security; to pledge, pawn, mortgage." 7 OXFORD ENGLISH DICTIONARY 581 (2d ed. 1989).

[13]The court acknowledges a debt of gratitude to Ms. Linda Faucheux, formerly archivist of The Historic New Orleans Collection, and currently a third year student and candidate for Juris Doctorate degree at Tulane University School of Law, whose translation of the French commentators and historical research, as reflected in her unpublished monograph of October 23, 1992, supply the historical backdrop for consideration of the concept of hypothecation.

a. *Roman Law*

"Hypothecate" stems from the Latin *hypothecare*.  The Greek verb *hypotithemi,* from which the Latin, French and English words derive, means to "lend money on pledge."[14]  Under Roman law the *hypotheca* developed as a form of *pignus* which, like pledge, included delivery of possession of the thing to the mortgagee or creditor.  Unlike *pignus,* however, *hypotheca* did not require delivery of the thing to the creditor.

The Roman law authority W.W. Buckland found that "[b]etween hypothec and *pignus* there was in strictness no legal difference, but there was the physical fact that in the former the thing was left in the hands of the debtor....  But it was equally possible to create hypothecs on a thing already held by a pledgee...."[15]  Buckland also referred to the findings of Erman, who "seems to show that *hypotheca* is in origin merely a Greek name for *pignus*....  Later jurists use it more freely and as synonymous with *pignus.*"[16]  Finally, Buckland maintained that the "*actio hypothecaria* is a distinct action ... for the enforcement of the possessory right, and applies equally to *pignus.*"[17]

Another Roman law authority, H.F. Jolowicz, thought that the "last form of pledge to develop was that known ... as *hypotheca,* i.e., the pledging of a thing by mere agreement, without the transfer of either ownership or possession."[18]  Extending the caution that the classical use of the word is disputed, Jolowicz also emphasized the flexibility of the term:

> *Pignus* and *hypotheca* are treated throughout [the Corpus Juris] as one and the same thing; in some cases possession is transferred at once, in others it is not, but that is all.  The word *pignus* is freely used for both cases and indeed occurs in the *formula* of the very action which made pledge without possession possible.  It is clear too that the particular case from which

---

[14]HENRY G. LIDDELL & ROBERT SCOTT, A GREEK-ENGLISH LEXICON 1898-99 (9th Ed.1940, repr. 1968).

[15]W.W. BUCKLAND, A TEXT-BOOK OF ROMAN LAW FROM AUGUSTUS TO JUSTINIAN 473 (1921).

[16]*Id.* n. 1 (citation omitted).

[17]*Id.* at 474 n. 2.

[18]H.F. JOLOWICZ, HISTORICAL INTRODUCTION TO THE STUDY OF ROMAN LAW 319 (2d ed. 1965).

*hypotheca* arose was one which was but a slight extension of the original principle.[19]

b. *French Law*

The French commentator Troplong regarded pledge and mortgage as different, particularly in that *hypothèque* left to the debtor the possession of the property that *pignus* or *pledge* took from him.[20] Troplong did, however, describe *hypothèque as a variant of* pignus.[21]

The French not only retained a later Roman distinction between pledge and mortgage in adapting Roman law governing security rights, but added another by restricting the *hypothèque* to immovable property.[22] The French Civil Code of 1804 (hereafter, the Code Napoleon) codified these differences.[23] Pothier, however, had drawn those distinctions earlier in his *Traité de l'Hypothèque.* The *hypothèque,* Pothier said, was the right of a creditor in the property of another, consisting of the power to cause the sale of the property for satisfaction of the debt. Pothier posited two forms of *hypothèques*: 1) *Nantissement* [pledge] or *pignus,* contracted by delivery of the securing property to the creditor; and 2) *hypothèque* [mortgage] "properly so called," contracted without delivery.[24] Pothier noted that although under the Romans all things in commerce—movable or immovable, corporeal or incorporeal—had been susceptible of hypothecation, under the French only immovables

---

[19]*Id.* at 319-20 (footnotes omitted). Discussing security devices under Roman law, Alan Watson proposed to "keep to the term *pignus* for a pledge delivered to the creditor and *hypotheca* for a pledge which was not delivered though for the most part the Romans did not bother with this distinction." ALAN WATSON, THE LAW OF OBLIGATIONS IN THE LATER ROMAN REPUBLIC 179-80 (1965). The statement attributed to the Roman Marcianus goes so far as to assert that between *pignus* and *hypotheca,* the only difference is in the names ("*inter pignus et hypothecam, tantum nominis sonus differt*"). 2 DICTIONNAIRE FRANCAIS ET LATIN DE LA LANGUE DES LOIS 160-61 (Ducasse, 1833).

[20]9 TROPLONG, LE DROIT CIVIL EXPLIQUE: DU NANTISSEMENT, DU GAGE ET DE L'ANTICHRESE 9, 14 (Hingray, 1847).

[21]*Id.* at 14.

[22]CAMILLE SOUFFLIER, VOCABULAIRE DE DROIT 224, 285 (Giard, 1908); VOCABULAIRE JURIDIQUE 393, 517 (Gerard Cornu ed., Presses Universitaires de France, 1987).

[23]CODE CIVIL [C.CIV.] arts. 2071, 2072, 2114, 2119 (fr.) (1804), *reprinted in* LES CODES FRANCAIS 173, 179 (Marescq, 1858).

[24]1 JEAN BAPTISTE HUTTEAU, RECUEIL DES DIVERS TRAITES SUR LES HYPOTHEQUES, L'ANTICHRESE ET LE NANTISSEMENT 1 (Letellier, 1809); 9 OEUVRES DE POTHIER 423 (Marcel at Billard, 3d ed. 1890).

were subject to the true *hypothèque*. According to Pothier, the customs of Paris and Orleans permitted no hypothecation of movables whatsoever. Where, as in Normandy, local customary law regarded movables as subject to hypothecation, this merely produced an imperfect form of security right, lasting only as long as the debtor retained possession of the movable. The security right on immovables, however, followed the property into whatever hands it passed, constituting, Pothier said, a true hypothèque.[25]

Here, the Code Napoleon consolidated customary law with written law, conclusively eliminating those customary laws by which some regions had regarded movables as subject to hypothecation.[26] While the *hypothèque* was defined as the real right itself, the Code Napoleon defined pledge (*nantissement* ) as the contract by which a debtor remitted a thing to his creditor as security for a debt.[27] A *hypothèque* applied only to immovable property, yet it remained possible to *pledge* a movable under "gage" [pawn], and an immovable under the contract denominated *antichrèse*.[28]

c. *Louisiana Codes*

The classifications of the Code Napoleon (or, more accurately, of its projet) were adopted by the redactors of the *Louisiana Digest of Civil Laws* in 1808. Thereafter, Louisiana "had no general *hypotheca* in regard to movables ... until 1912, when the first chattel mortgage act was passed," applying only to corporeal movables.[29]

The translation from French to English in the Louisiana Civil Code of 1825 renders "*d'hypothèquer*" or "to hypothecate" as "to mortgage." An example, found in article 3116, under Title 19 governing Pledge, read: "where the power of attorney contains a general authority to

_____

[25]HUTTEAU, *supra* note 24, at 14-15; OEUVRES, *supra* note 24, at 434-35.

[26]HARRIET SPILLER DAGGETT, LOUISIANA PRIVILEGES AND CHATTEL MORTGAGE 14 (Louisiana State University, 1942).

[27]C.CIV. art. 2071, 2114 (1804).

[28]C.CIV. art. 2072, 2114 (1804).

[29]DAGGETT, *supra* note 26, at 16, 21.

mortgage the property [*pouvoir general d'hypothèquer les biens*] of the principal, this power includes that of giving it in pledge [*de les donner en nantissement* ]."[30] This language survives as article 3149 of the Revised Civil Code of 1870. The hypothecary action for enforcement of the real security right obtained through mortgage survives in the Louisiana Civil Code[31] and in the Louisiana Code of Civil Procedure as well.[32]

d. *Louisiana Statutes*

"Hypothecate" and its variations occurs as well in particular provisions of the Louisiana Revised Statutes of 1950. For example, the statutory title governing banks and banking accords an institution the power "[t]o borrow money and to mortgage, pledge, hypothecate, or grant a security interest in any of its assets to secure such borrowings."[33] The conjunction "or" here would not seem to indicate that "hypothecate" stands separat e in meaning and function from either "pledge" or "mortgage," or even from "granting a security interest" for that matter.

The most expansive statutory use of the term is in the Louisiana Business Corporation Law, which gives a corporation or association the power "[t]o make contracts and guarantees ... to incur liabilities, to borrow money, to issue notes, bonds and other obligations, and to secure any of its obligations by hypothecation of any kind of property."[34] "Hypothecation" here clearly denotes any recognized method of creating a security interest in any form or type of property.

e. *Louisiana Contracts and Jurisprudence*

Despite such limited Code and statutory uses of "hypothecate" or its derivatives, referring only to mortgage, and the treatment of pledge under a separate title of the Civil Code, opinions of the Louisiana courts have used the terms "hypothecate" and "hypothecation" much less precisely and

---

[30]*A Republication of the Projet of the Civil Code of Louisiana of 1825, in* 1 LOUISIANA LEGAL ARCHIVES 361 (1937).

[31]LA.CIV.CODE ANN. arts. 3399-3410 (West 1952 & Supp.1992).

[32]LA.CODE CIV.PROC. arts. 3721-3743 (West 1961 & Supp.1992).

[33]LA.REV.STAT.ANN. 6:242 (West 1986 & Supp.1992).

[34]LA.REV.STAT.ANN. 12:41 (West 1969).

much less restrictively, usually as a result of language drawn from the specific contracts or security agreements under scrutiny at the time. Several examples demonstrate the importance of context in determining the intended meaning of the term. When "hypothecate" occurs in combination with terms such as "pledge" or "mortgage," the conjunction "and" may or may not indicate that the additional term has a separate meaning, and "or" may or may not introduce a separate idea with a meaning exclusive of the other words in the same series. There seems to be no pattern to distinguish the use of "hypothecate" as a synonym from its use as a discrete transaction. For example, in *Succession of Onorato,*[35] opponents of a succession argued that a writing by the decedent acknowledging 1) himself as their debtor, and 2) that insurance proceeds should pay the debt "constitute[d] a pledge or hypothecation of such life insurance policies[.]"

This phraseology found use earlier in *Fasterling v. Kahn.*[36] Justice O'Neill, affirming the trial court's finding of fraudulent misrepresentation by which plaintiff had been relieved of valuable stocks, stated that the defendants "were not the owners of the stock ... and had no right to pledge or hypothecate it." This eminent Louisiana jurist was clearly using "hypothecate" as a synonym of "pledge," not as an additional mode of encumbering stock distinct from pledge.

*First Guaranty Bank v. Alford,*[37] addressed a wife's liability, under a pledge agreement executed as part of a collateral mortgage, for debts subsequently contracted by her husband. The court's description of the instruments executed by the husband included mention of two pledge agreements by which he "pledged and hypothecated" other instruments as security for the later obligations. Here again, "hypothecated" clearly is used as a synonym for "pledge."

In *Baton Rouge Wood Products, Inc. v. Ezell,*[38] the language of a pledge agreement stipulated that the party executing it did "pledge and hypothecate" securities. Similarly, in *Webster v. Harman,*[39]

---

[35]219 La. 1, 51 So.2d 804, 807 (1951).

[36]163 La. 424, 112 So. 33 (1927).

[37]366 So.2d 1299, 1301 (La.1978).

[38]251 La. 369, 204 So.2d 395, 398 (1967).

[39]148 La. 1080, 88 So. 462, 463 (1921).

the cited language came from a contract by which the plaintiff agreed to "pledge and hypothecate into and in favor of [defendant] forty (40) shares of ... capital stock." This contract was later referred to by Justice Provosty in the same opinion as "the pledge which [defendants] held of plaintiff's 40 shares of stock."[40] The opinion in that case also refers to a power of attorney that grants the power "to sell, pledge, mortgage, hypothecate or otherwise incumber any and all shares of stock held by [plaintiff]."[41] As both pledge and mortgage are expressly listed, the scrivener's use of "hypothecate" must be as a synonym for either or both, much as is "incumber" there.

Additional examples are found in two Louisiana circuit opinions. In *General Motors Acceptance Corp. v. Crain Chevrolet-Olds-Pontiac, Inc.,*[42] the court made note of the collateral mortgage provisions by which the dealer agreed that he "mortgages, affects, and hypothecates" his inventory, the merchandise, to remain so "mortgaged and hypothecated until payment in full of the Note and any obligations secured by the pledge thereof." And in *Plumbing Supply House, Inc. v. Century National Bank,*[43] the court described "an hypothecation agreement authorizing [plaintiff corporation] to pledge [a] ne varietur note as security."

f. *Current Louisiana Usage*

The point we so belaboredly make is that neither the history, the sources, the terminology of the current codes and statutes, nor the jurisprudence conclusively and absolutely define the word "hypothecate" either to include or to exclude the concept of encumbering movables. Nor do we find that *to hypothecate* absolutely includes or excludes delivery of possession. The conclusion that does come through "loud and clear," however, is that the drafters of statutes and legal instruments in current Louisiana practice appear to play rather fast and loose with the verb, *to hypothecate.* Part of such practice, we suppose, is the untidy but prevalent penchant of lawyers to invoke the mystique of the profession's glossary of archaic and anachronistic terms without bothering to identify the

[40]*Id.* at 464.

[41]*Id.*

[42]595 So.2d 346, 349 (La.Ct.App.2d Cir.1992).

[43]440 So.2d 173, 175 (La.Ct.App. 4th Cir.1983).

precise legal meaning of the terms thus employed. That tendency, coupled with an equal penchant for invoking solemnity by including several synonyms—usually the Biblical three—for the desired word when that one word alone would suffice, leads to controversies (such as the instant litigation) that could be avoided by a drafting technique that is more precise and less pretentious. Code provisions, Revised Statute provisions, and documents quoted or referred to in the jurisprudence illustrate just such imprecise, surplus usage o f "hypothecate" when all that is required is the word "pledge" if that is what is intended, or "mortgage" if that is what is intended, or "encumber" if the broader, all inclusive concept is intended.

All of this leads to one inescapable conclusion: To ascertain what the parties intend in using the term "hypothecate," the context in which that term is used must be examined, and that examination must be conducted according to Louisiana's rules for interpreting contracts. When we do that in the instant case, we are disabused of any doubt that, in confecting Article VIII, the drafter of the Articles of Incorporation of Lucullus, Inc., could only have been using "hypothecate" as a synonym—albeit an unnecessarily fancy, "legalese" one—for "pledge."

g. *Louisiana Rules of Contractual Interpretation*

Our finding is confirmed when the methodology used in making it is tested by the applicable Louisiana rules of interpretation. Even though the Articles of Incorporation of a Louisiana business corporation implicate public administration through the office of the Secretary of State, such instruments are contracts, first and foremost. As such, they are to be construed according to the rules found in Book III, Title IV, Chapter 13, *Interpretation of Contracts,* of the Louisiana Civil Code.[44] The bankruptcy court invoked only one among that "baker's dozen" of articles to support its restrictive interpretation of Article VIII's use of "hypothecate," thereby excluding *pledge* from the meaning of "hypothecate."[45] When we visit all thirteen articles of Chapter 13, however, we reach the opposite result.

Skimming quickly, we observe first that article 2045 defines interpretation of a contract as

---

[44]LA.CIV.CODE ANN. arts. 2045-2057 (West 1987).

[45]LA.CIV.CODE ANN. art. 2047.

"the determination of the common intent of the parties." Article 2046 eschews further interpretation when the words of the contract are clear and explicit "and lead to no absurd consequences."

The reliance by the bankruptcy court on the next rule, article 2047, is questionable: Although we find the first sentence of article 2047 ("The words of a general contract must be given their generally prevailing meaning.") significant to the instant inquiry, the second sentence ("Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.") may well be irrelevant here. The bankruptcy court relied on that second sentence as authority to use the technical *legal* meaning of "hypothecate."

But it is axiomatic that legal terms are always given their legal meaning. As such, the phrase "words of art and technical terms" in art. 2047 refers to technical terms of art from other disciplines, such as the social sciences, the earth sciences, engineering, the construction industry, the oil and gas industry, and the like.[46]

Article 2048, the one next following the article cited by the bankruptcy court, impresses us as being more to the point of the instant inquiry than is article 2047. Article 2048 instructs that "[w]ords susceptible of differing meanings must be interpreted as having the meaning that best conforms to the object of the contract." We have already demonstrated that "hypothecate" can have any of several meanings: mortgage only; pledge only; or any encumbrance, including both mortgage and pledge. Here, corporate stock is the object of the Articles of Incorporation of Lucullus, the contract in question. As Louisiana corporate stock is not susceptible of mortgage, defining "hypothecate," as in a restriction on alienation of corporate stock, to cover only *mortgage,* relegates that verb to meaningless surplusage. On the other hand, interpreting the restriction's use of

---

[46]*See, e.g., Reliance Ins. Co. v. Orleans Parish School Bd.,* 322 F.2d 803, 806 (5th Cir.) ("Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong." (quoting LA.CIV.CODE ANN. art. 1947)), *cert. denied,* 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 186 (1964); *McCoy v. United Gas Public Serv. Co.,* 57 F.Supp. 444, 445 (W.D.La.1944) (holding phrase in mineral lease to be construed according to meaning of terms commonly understood in oil and gas industry; *Agnelly v. Lauricella,* 383 So.2d 813, 815 (La.Ct.App. 4th Cir.1980) (finding accountant's testimony proper proof of meaning of accounting term used in contract); *Southern Excavation, Inc. v. Department of Highways,* 292 So.2d 310, 312-13 (La.Ct.App. 1st Cir.1974) (The phrase "conditions considered unsuitable for the prosecution of the work" used in contract granting engineer authority to suspend work given meaning understood in construction trade.).

"hypothecate" to mean *pledge* conforms precisely to the object of the contract and gives that verb a sensible meaning in the phrase. Thus article 2048 augurs for an interpretation of "hypothecate" that at a minimum includes pledge, and more properly includes any encumbrance applicable to corporate stock, while at the same time eschewing *mortgage* because corporate stock is not susceptible of mortgage.

This conclusion draws further support from the next Code article in the series. Article 2049 moves from consideration of single *words* to consideration of entire *provisions,* stating that "[a] provision susceptible of different meanings must be interpreted with the meaning that renders it effective and not one that renders it ineffective."[47] As corporate stock cannot be mortgaged, the bankruptcy court's interpretation of "hypothecate" in the Lucullus stock restriction provision to mean mortgage rendered it nugatory. Giving "hypothecate" its extensively used, broader meaning of *pledge* in particular or *encumber* generally renders it effective in the context of restrictions on alienation of corporate stock as mandated by article 2049.[48]

At the time of Hill's transaction, pledge was the only nominate security device applicable to

---

[47]*See, e.g., West v. Kerr McGee Corp.,* 586 F.Supp. 493, 499 n. 8 (E.D.La.1984) (recognizing that a clause in contracts should be interpreted in a manner that does not render the clause redundant), *rev'd on other grounds,* 765 F.2d 526 (5th Cir.1985); *Wier v. Texas Co.,* 79 F.Supp. 299, 310 (W.D.La.1948) (holding that if a contract is susceptible to two interpretations, the court must adopt the meaning that will uphold rather than destroy the contract's validity), *aff'd,* 180 F.2d 465 (5th Cir.1950); *Robbert v. Equitable Life Assur. Soc.,* 217 La. 325, 46 So.2d 286, 288 (1950) (same); *Lower Terrebonne Ref. & Mfg. v. Barrow,* 126 La. 263, 52 So. 487, 489-90 (1910) (holding that a contract cannot be interpreted to defeat the main purpose indicated by its provisions taken as a whole or impute use of language without meaning or effect); *Franks Petroleum, Inc. v. Mayo,* 438 So.2d 696, 699 (La.Ct.App. 2d Cir.) (Contracts are construed to lead logical conclusions and give effect to obvious intention of parties; they must be interpreted in a common-sense fashion according to common and usual significance of terms.), *writ denied,* 443 So.2d 595 (La.1983).

[48]*See* LA.CIV.CODE ANN. arts. 2050 (West 1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."); 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."); 2054 ("When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves no only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in the contract of that kind or necessary for the contract to achieve its purpose."); 2055 ("Usage ... is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.").

corporate stock under Louisiana law.[49]  By definition the conventional mortgage and the archaic antichresis apply only to immovable property.  So, in the context of restricting alienation of corporate stock, "hypothecate" could not have referred to mortgage even if that were the limited technical meaning of that verb in late Roman law, in French law, and in the Louisiana Civil Code.  Likewise, "hypothecate" could not refer to chattel mortgage because in Louisiana chattel mortgage is available to encumber corporeal movables only, and corporate stock is classified as an incorporeal movable (even though for purposes of official transfer such stock is sometimes deemed to be "corporealized" into the certificate that represents it).  Conceivably, the use of "hypothecate" in Article VIII of the Lucullus charter could have referred to the innominate security transaction of "assignment" in its pignorative connotation rather than its title-transferring connotation.  But in this case such use would be redundant, given that "assign" is the word next following "hypothecate" in Article VIII.  Clearly, then, in the context of a restriction on alienation of Lucullus stock, "hypothecate" is synonymous with "pledge."

Any lingering doubt is removed by reading Article VIII *in pari materia* with the legend that appears on the stock certificate.  Given the almost universal practice among Louisiana lawyers who incorporate closely-held businesses of preparing a comprehensive "package" of documents at the time of incorporation—not merely Articles of Incorporation but such ancillary instruments as Bylaws, Minutes, Shareholders' Agreements, *and* stock certificates for original issues of shares—we speculate that the same scrivener who prepared the Articles of Incorporation for Lucullus, Inc. prepared the stock certificates issued to the founders (including Hill) on September 25, 1984.  The Articles of Incorporation are dated September 13, 1984;  they were filed and recorded in the office of the Louisiana Secretary of State on September 17, 1984.  Dunne was named as the sole incorporator of Lucullus, but the corporation's Initial Report, executed and filed contemporaneously with the Articles, lists Hill as 1) the registered agent, 2) one of the three initial Directors of the corporation, and 3) its

---

[49]Since Hill's purported pledge of his stock to the Bank, Louisiana has adopted its own version of Article 9 of the Uniform Commercial Code, which was effective January 1, 1990, and permits creation of a "security interest" in shares of corporate stock.  *See, e.g.,* LA.REV.STAT.ANN. § 10:9-203 (West Supp.1992).

Vice President. The legend on the reverse side of the stock certificate—referring as it does to restrictions "set forth in the by-laws (or Articles as the case may be)"—is obviously standard "boilerplate" verbiage employed by the drafter here and in his general corporate practice. The legend makes no mention of pledge, hypothecation, sale or any other particular transactions. It does, however, refer generically both to "transferred" and "encumbered" when describing the types of transactions that are conditioned on compliance with the provisions of the restriction.

Reference to encumbrance in the legend is strong evidence that the provisions of Article VIII are not intended to cover title-transferring transactions only; and, indeed, the bankruptcy court recognized that at a minimum "hypothecate" referred to mortgage, itself a pignorative contract not translative of title. Again, irrespective of the context of its use, "hypothecate" can only have one of its possible meanings: mortgage of immovable property only; encumbrance of either movable property or immovable property; or both. As Article VIII applies to no property other than corporate stock, which is an incorporeal movable, and as the legend on the certificate refers to *transfer* and *encumbrance,* the legend supports Adler's contention that "hypothecate" here has to mean *pledge*—or mean nothing at all. But, as expressed in Article 2049 of the Civil Code, the law abhors an interpretation that results in the language of a contract having no meaning at all.

CONCLUSION

Given the history, usage, context and determined intent of the parties here, we are led to the unavoidable conclusion that the charter provisions to which the Bank was referred by the legend on Hill's stock certificate do apply to pledge. Hill ignored the restriction and failed to comply with the requirement that he first offer his stock, through the corporation, to the other shareholders at book value before hypothecating (pledging) such stock. The Bank officer who accepted Hill's deficient pledge did not ignore the restriction; to the contrary, he acknowledged his awareness that the stock was "legended" by writing to the corporation to advise it of the pledge, acknowledging (mistakenly) that the stock nonetheless would not be sold without offering it to the shareholders first. As we find that, under the totality of the circumstances, the prohibition against hypothecation is congruent with a prohibition against pledge, the purported pledge by Hill to the Bank was voidable—not necessarily

by Hill or the Bank as knowing parties to the deficient transaction, but by those to whom the duty created by the restriction ran: the corporation and the other shareholders. And, by virtue of the bankruptcy law, the trustee of Hill's Chapter 7 estate is another party entitled to assert the relative nullity of that transaction. The trustee did so, and in a timely and proper manner.

For the foregoing reasons, we reverse the holding of the bankruptcy court, and the affirmation thereof by the district court, and render judgment in favor of Adler as trustee and against the Bank, annulling the pledge and thereby freeing the subject 25 shares of Lucullus, Inc. stock of that impediment. As a result, we find that such stock must be included among the unencumbered assets of the estate, free of any secured position of the Bank therein. Therefore, the judgment of the bankruptcy court and the affirmation thereof by the district court are reversed and the case is remanded to the bankruptcy court for further proceedings consistent herewith.

REVERSED, RENDERED and REMANDED.