Executors and administrators ⊚⇒17(5), 20(10) —Succession; discretion of judge in appointing administrator will not be disturbed unless manifestly wrong.

Where two brothers were contestants for the administration of the successions of their parents, an appointment made by the trial judge is in his discretion under Rev. Civ. Code art. 1043, and will not be disturbed where not manifestly wrong; no disqualifications of the appointee appearing, and there being no overwhelming reason why the other or both should have been appointed.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Application by Frank Eberle to be appointed administrator of the successions of Frank Adams Eberle and of Magdalena Meyer Eberle, deceased, opposed by George Eberle. From an order appointing applicant as administrator, George Eberle appeals. Affirmed,

J. Zach Spearing and E. P. Kleinert, both of New Orleans, for George Eberle and others.

L. H. Gosserand, and W. O. Hart, both of New Orleans, for Frank Gordon Eberle.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

ST. PAUL, J.  Frank Eberle applied to be appointed administrator of the successions of his father and mother.  George Eberle opposed the application, praying that he be appointed instead of his brother, and in the alternative that both be appointed.  The trial judge appointed Frank, and George appeals.

We find nothing in the evidence to show that Frank Eberle is in any way disqualified to be appointed, or showing any overwhelming reason why George should be appointed in his stead, or why two administrators should be appointed instead of one. In other words, we find nothing therein to show that the trial judge abused the discretion which he undoubtedly had under the circumstances.  R. C. C. art. 1043.

In Succession of Chaler, 39 La. Ann. 308, 1 South. 820, this court said:

"When two beneficiary heirs are contestants for the administratorship of the ancestor's succession in the choice of the administrator a large discretion is vested in *the judge who makes the appointment* and, unless manifestly wrong, his conclusion will not be disturbed." (Italics ours.)

### Decree.

The judgment appealed from is therefore affirmed.

---

### (99 South. 477)

### No. 23715.

### MARTIN v. McCLOSKEY.

(Dec. 3, 1923.   Rehearing Denied by Whole Court March 3, 1924.)

*(Syllabus by Editorial Staff.)*

1. Guaranty ⊚⇒89—Burden of showing failure of consideration held upon defendant, and not on plaintiff.

In an action on a contract, wherein defendant guaranteed to hold plaintiff harmless under

a subscription to stock in defendant's corporation, and to reimburse him for losses on sale or liquidation of the company, the burden was not on plaintiff to prove a consideration, but was on defendant to show that it was made without a just and legal cause.

**2. Guaranty ⊚⇒16(3)—Agreement protecting purchaser of corporation stock from loss held supported by sufficient consideration.**

A contract whereby defendant guaranteed to hold plaintiff harmless from loss on a subscription to stock in defendant's corporation was supported by a consideration where it appeared that it was to the advantage of defendant, who was a controlling stockholder, that the corporation be kept intact, and that plaintiff refrain from exercising his right to annul his subscription or to institute other legal proceedings; the contract also providing that plaintiff should first offer his stock to the company at par before offering it to others.

**3. Guaranty ⊚⇒50—Participation in corporation's affairs held not to affect guaranty against loss under stock subscription.**

In an action on a contract, whereby defendant guaranteed to hold plaintiff harmless from loss under a stock subscription, that plaintiff participated in the affairs of the corporation after discovering its insolvent condition could not affect the validity of the agreement, which was supported by an ample consideration when given.

**4. Guaranty ⊚⇒31—Contract covering loss on stock subscription held joint and not solidary.**

Where a contract whereby defendant and another as "we the undersigned" guaranteed plaintiff against loss because of a subscription to corporate stock, the promise was joint, and not solidary; and where defendant only was sued he was liable only for half of the undertaking.

O'Niell, C. J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by F. L. Martin against John McCloskey. Judgment for defendant, and plaintiff appeals. Judgment annulled, and judgment for plaintiff rendered.

J. Zach Spearing, of New Orleans, for appellant.

McCloskey & Benedict, of New Orleans, for appellee.

By the WHOLE COURT.

DAWKINS, J. Plaintiff brought this suit upon the following instrument:

"New Orleans, La. May 26, 1914.

"Whereas, Mr. Francis L. Martin, of this city, has subscribed to 500 shares of the capital stock of the Importer's Coffee Company, Ltd., and paid therefor at par in cash, and desires to be protected against any depreciation therein upon any liquidation or sale of said company:

"Now, therefore, we, the undersigned, hereby guarantee to hold harmless said Martin under said subscription, and to reimburse to him in cash any amount below the par value of said stock which he may sustain upon sale, or liquidation of the company, said Martin binding himself to first offer said stock to the company at par. John McCloskey. Mrs. Katherine McCloskey Hagerty, Administratrix, Estate William P. Hagerty."

He alleged that he had invested $50,000 in the stock of said Importer's Coffee Company, Limited; that defendant had paid upon said obligation $13,000; and prayed for judgment for the balance of $37,000 with legal interest.

Defendant admitted executing the promise, but pleaded that it was without consideration, and reconvened for the $13,000 admitted to have been received by plaintiff, upon the averment that it had been advanced as a loan. In the alternative, defendant averred that in no event could he be held liable for more than his virile share of one-half of the claim.

There was judgment below for defendant, rejecting plaintiff's demand, and in reconvention for the $13,000 previously received; from which judgment plaintiff appeals.

Opinion.

After a careful examination of the record, we find the following to have been the facts:

Believing that the Importer's Coffee Company, Limited, was doing a successful business, defendant approached plaintiff and induced him to agree to invest therein. In or-

der to do this, it was necessary that the capital be increased. All of the then authorized stock had been issued. The majority was owned by defendant, and the remainder stood in the name of an unmarried daughter and a son-in-law. The company was a heavy borrower at the banks, and it was agreed that plaintiff should lend the corporation the sum which he wished to invest ($50,000) until the charter could be amended to permit the issuance of additional stock. Plaintiff interviewed the vice president (defendant's son-in-law), and made such other inquiries as to convince him that the business was a great success, as was thought and represented by defendant, and his money was paid and notes taken therefor, all to mature about the time of the reorganization. In the meantime, an examination by a public accountant of the corporation's affairs was made, and it seemed to confirm the statement of the president and vice president. This report purported to represent conditions as of January 1, 1914, but was dated March 5th, and plaintiff's money had been advanced in February. The vice president and general manager died March 18th, and thereafter witnesses say rumors were started by an employé to the effect that something was wrong; but if they preceded the meeting of stockholders of March 31, 1914, no one, including both plaintiff and defendant, appeared to attach any importance thereto. The reorganization was perfected; plaintiff surrendered his notes and took stock as contemplated; defendant accepted stock for supposed profits, bought additional stock, and outsiders subscribed and paid for other stock, all upon the belief that it was a good investment. The very next day the employé, who was said to have started the "rumor," made specific charges, and the defendant ordered an immediate investigation by the accountant, who had meantime become a stockholder.

The result of this last examination showed that, instead of making a profit of $60,000 (60 per cent.) the year before, it had lost $79,000, and the company was insolvent by more than $25,000. There is some dispute as to just when these disclosures commenced to unfold, but we conclude that it must have been April 1st, because defendant says he immediately reported the information to the accountant, and the latter, following a custom of some 25 years, recorded it in his diary as "Wednesday, April 1st, 1914." However, the report of this expert was not completed in time to be filed with the company at the annual meeting of May 4, 1914, and adjournment was taken for that reason until the 26th of that month.

In the meantime, it appears that McCloskey, the defendant, learned of the true condition, and requested Wermuth, the accountant, to inform Martin, and to assure the latter that he should not lose anything on account of the unfortunate discoveries. McCloskey then saw Martin and informed him that Wermuth wished to see him; Martin visited Wermuth, and was for the first time apprised of the disastrous conditions, and given McCloskey's message of assurance that he would be protected. Martin says he saw and discussed with McCloskey the matter at different times between that date and May 26th, and that defendant offered and promised to give him such guaranty, either in the shape of a note or bond, and that he expressed a preference for the bond. McCloskey denies that he agreed to put the promise in writing, but does not dispute making it.

In any event, on May 26, 1914, after the corporate meeting was closed at which the true conditions had been formally reported and certain stock issued for supposed profits had been ordered canceled, McCloskey directed his counsel, who had become a stockholder and director, and who was also pres-

ent in the company's office at the time, to prepare a guaranty in plaintiff's favor against loss from the investment, and to make it as strong as he could. This was done without any discussion at the time; and Mr. Benedict wrote out and McCloskey signed the document above quoted.

Thereafter the business was carried on until March 25, 1916, nearly two years, with plaintiff acting as an officer and director of the corporation; and, in the meantime, defendant invested many thousands of dollars additional therein in the shape of loans and the purchase of additional stock. Unfortunately, however, it proved very unsuccessful, the World War having started in the meantime, and on the date mentioned last the business was sold to another company for a price which left it woefully insolvent.

On or about May 14, 1913, defendant gave to the plaintiff stock in D. H. Holmes Company, Limited, of this city, valued at $12,180 and his personal check for $820, or a total of $13,000; for which plaintiff surrendered to the Importer's Coffee Company, Limited, a certificate of that company's stock for 250 shares ($25,000 par value), and there was issued to him instead one for 120 shares ($12,-000), or $13,000 less, which deficiency exactly equaled the sum of the value of the Holmes Company stock plus the check for $820. Stock was then issued by the Importers' Coffee Company, Limited, to McCloskey for the shares which Martin surrendered.

Plaintiff and defendant differ in their testimony as to the nature of this last-mentioned transaction; the former claiming that it was a payment and recognition by defendant pro tanto upon his guaranty obligation, while the latter says that Martin appealed to him for funds to be used in repairing his residence, and that the advance was made, in the nature of a loan for that purpose. However, without finding it necessary to discuss the matter at length, we conclude that the circumstances corroborate plaintiff's version, and that it was a partial settlement under the guaranty obligation.

[1] The lower judge filed a lengthy written opinion or "reasons for judgment," in which he concluded that the obligation sued upon was one of guaranty or indemnity, as distinguished from suretyship, and, finding that no consideration had been proven, held that defendant was not bound. He (the judge) opened his discussion of the legal issues with the assertion that "the burden is on plaintiff to prove the consideration" for the promise. However, such is not the law. As was said by this court in the early case of Barrow v. Cazeaux, 5 La. 78:

"By our law, an agreement is not less valid though the cause be not expressed. La. Code 1888 [now 1894 R. C. C.]. Toullier, in commenting on the corresponding article of the Napoleon Code, says, a just cause is always understood, unless the contrary be proved, and if the cause expressed is proved to be a bad one, then the obligation is null and void, unless the creditor shows there were other just considerations for it. It was, therefore, for the party promising in this case, after the promise was proved, to discharge himself from its effects, by a showing that it was made without a just and legal cause. Toullier, No. 6, lib. 3, tit. 3, c. 2, Nos. 175, 176, 177."

See, also, Brashear v. Hazard, 12 Rob. 328; Byrne v. Grayson, 15 La. Ann. 457; Pack v. Chapman, 16 La. Ann. 366.

The lower court, having erroneously stated the law as indicated, proceeded to find, as a matter of fact and law, that there was no consideration, adopting largely the assertions of defendant as a witness, and the arguments now made in his behalf as to the legal result.

Regardless as to whether, in the beginning, defendant promised to protect plaintiff against loss, which is affirmed by the one and denied by the other, we think it conclusively established that, when the discovery of adverse conditions was made, defendant,

perhaps from lofty motives, began to assure plaintiff that he would not lose anything, and to promise to hold him harmless on account of the investment.

At this particular time defendant was not only a holder of the corporation's stock to the extent of more than $100,000, but was also individually liable on indorsements or by virtue of credit guaranty to the local banks for more than $300,000, as well as being a direct creditor for several thousand dollars. It was therefore highly important to him that the corporation's affairs, which he largely controlled, be held intact until it could be seen what was best to be done, and in order that an attempt could be made to work it out if possible. He must have appreciated that the plaintiff, in view of the misrepresentations (fraudulent at least on the part of the vice president), was in a very strong position for either claiming an annulment of his subscription to the stock or for instituting other legal proceedings which might have embarrassed and perhaps prevented a continuation of the business.

Again, it must not be overlooked that, as pointed out by plaintiff's counsel, the obligation bound plaintiff not to sell said stock without first offering it "to the company at par." In other words, he was not at liberty thereafter to dispose of it without first offering it to the corporation "at par." This was not only a limitation upon his rights to dispose of the stock of the corporation, in which defendant was overwhelmingly the one most heavily interested, but it was intrinsic evidence of the latter's wish and purpose to guard against the stock getting into the hands of other persons who might "cause trouble" along the lines which have been suggested as being open to plaintiff.

[2] In view of all this, can it be said that there was not a consideration, both in the presumed advantages flowing to defendant, and in the foregoing by plaintiff of rights

and remedies which were open to him? We think not. Benner v. Van Norden, 27 La. Ann. 473, and annotations in West's Reprint La. Reps. Cyc. vol. 2, p. 81.

[3] We do not consider that the subsequent participation of plaintiff in the affairs of the corporation and the hope of all concerned that it might be worked out and the investment saved can affect the validity of the promise for which there was present ample consideration when given. The corporation has been liquidated and the stock has no value.

[4] There can be no question but that the promise was joint and not solidary. The other party, the administratrix, has not been sued in this case. Defendant was liable for only half of the undertaking, or $25,000; he has already paid $13,000, and plaintiff should recover the balance with interest from judicial demand.

For the reasons assigned, the judgment appealed from is annulled and set aside; and it is now ordered and decreed that plaintiff have and recover judgment against defendant for the sum of $12,000, with legal interest from judicial demand, and all costs.

O'NIELL, C. J., dissents.

Rehearing refused by the WHOLE COURT.