# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 29, 2008

Charles R. Fulbruge III
Clerk

No. 07-30335

A. SAM COURY, Dr

Plaintiff-Appellee

v.

SHARON K. MOSS; JULIE T. LANDRY; WILLIAM C. MOSS; COURY
MOSS, INC.; and MOSS MANAGEMENT CORPORATION

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Louisiana

Before WIENER, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This interlocutory appeal from a partial summary judgment in a shareholder derivative action is another chapter in the twenty-year family dispute[1] involving Coury-Moss, Inc. ("CMI"), a Louisiana closely held corporation doing business as Moss Motors, which operates franchise automobile dealerships in Lafayette, Louisiana.[2] The issue is whether the defendants can defeat the

---

[1] See, e.g., Succession of Moss, 943 So. 2d 553 (La. App. 3d Cir. 2006); Succession of Moss, 769 So. 2d 614 (La. App. 3d Cir. 2000); Moss v. Coury, 704 So. 2d 1248 (La. App. 3d Cir. 1997); Moss v. Coury, 613 So. 2d 270 (La. App. 3d Cir. 1992); Moss v. Coury, 602 So. 2d 175 (La. App. 3d Cir. 1992); Coury v. Coury Moss, Inc., 510 So. 2d 1316 (La. App. 3d Cir. 1987).

[2] We have diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiff-Shareholder A. Sam Coury is a resident of Oklahoma; the defendants are individual

shareholder derivative action brought here by A. Sam Coury ("Coury") by having CMI purchase his shares at book value because he previously sold them to a third person without complying with CMI's right of first refusal as required by the Articles of Incorporation. The district court refused to dismiss the suit and granted partial summary judgment holding that Coury had not sold or transferred his stock to anyone. Pursuant to 28 U.S.C. § 1292(b), the district court stated that the judgment involves a controlling question of law and that an immediate appeal may materially advance the ultimate termination of the litigation, and we exercised our discretion to permit the defendants to appeal from that judgment. We affirm the partial summary judgment in favor of Coury for substantially the same reasons assigned by the district court.[3]

## I. BACKGROUND FACTS

---

and corporate residents of Louisiana; and the amount in controversy exceeds $75,000.

[3] Although at first blush it appeared that the issue in this appeal had been decided by the Louisiana state courts in previous litigation between the parties, see, e.g., Coury v. Moss, 613 So. 2d 270 (La. App. 3d Cir. 1992); Moss v. Coury, 602 So. 2d 175 (La. App. 3d Cir. 1992), the additional briefs we requested from the parties, and their agreement on the point, have persuaded us that under the Louisiana law governing the preclusive effects of the judgments in these two prior state cases, the issue is not precluded. See La. Rev. Stat. Ann. § 13:4231 (1990). Although the Louisiana law was later amended to broaden the preclusive effects of judgments, the subsequent legislation specifically provided that "[t]he preclusive effect and authority of a judgment rendered in an action filed before the effective date of this Act shall be determined by the law in effect prior to January 1, 1991." See 1990 La. Acts 521, at § 5; see also McClendon v. Dep't of Transp. & Dev., 642 So. 2d 157, 159 (La. 1994). The prior version of Louisiana law stated:

> The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.

See La. Rev. Stat. Ann. § 13:4231 (1990). The parties represent and concede that the above cited state court cases involved solely the issue of whether Coury owned certain litigious rights to the Coury-Moss litigation, not whether Coury owned his 250 shares of CMI stock. Therefore, as the parties agree, because "the object of the judgment" and "[t]he thing demanded" are not the same in the present litigation, the issue is not precluded here.

Coury, plaintiff and minority owner of CMI stock, brought this shareholder derivative action alleging "self-dealing" against his sister, Sharon Coury Moss (CMI president, stockholder, and board of directors member); Julie Landry (CMI head accountant, bookkeeper, and board member); William C. Moss (CMI general manager and son of Sharon Moss); CMI itself; and Moss Management Corporation, a Louisiana corporation (collectively, "Defendants").

On July 3, 1979, William J. Moss ("Bill Moss"), Sharon Moss's now deceased husband, and Coury executed CMI's Articles of Incorporation. By means of Article X, they agreed that "no shareholder may sell any [CMI] stock . . . without first offering it to [CMI] on the basis of book value."[4]

On March 19, 1986, Coury filed a voluntary petition for bankruptcy. The assets of the bankruptcy estate included, by reference only, Coury's shares of CMI

---

[4] Specifically, Article X provides:

No shareholder may sell any stock of this corporation without first offering it to this corporation on the basis of book value. Said offer must be made by delivering to the Secretary of this corporation, against written receipt, the certificates representing said stock, endorsed in blank, with a written offer to sell said stock and this corporation shall have the right, for a period of fifteen (15) days from the delivery of such offer, to purchase the stock of said shareholder, for cash, at the book value as shown by the last preceding statement of this corporation, after which fifteen (15) days the said shares may be sold without restriction.

No sale of any stock of this corporation shall be valid and binding until and unless the opportunity to purchase such shares has been given to this corporation in the manner this article provided; and, this right, so vested in this corporation, shall follow any stock of this corporation so sold without such opportunity being given into any hands into which it may pass. Such right may be exercised against the holder(s) of such stock up to thirty (30) days after such shares are tendered for transfer on the books of this corporation, and no transfer of any such shares shall be made on the books of this corporation without the written consent of all of the other record holders of stock of this corporation, during the pendency of said thirty (30) day period.

The right vested in this corporation to purchase the stock of any shareholder of this corporation desiring to sell any stock of this corporation may be waived, in writing, by all of the other record shareholders of this corporation at any time.

3

stock and his interest in pending litigation involving CMI. Since their issuance, the certificates representing Coury's shares have never left Coury's possession and their registration in Coury's name on the CMI records has never been changed. Recognizing that the bankruptcy trustee could cause the bankruptcy estate to sell these assets to a third person, Coury, on December 23, 1988, entered a written "Ratification and Agreement of Exchange" with Coury, Ltd., an Oklahoma limited partnership of which Coury is general partner, to exchange assets of Coury, Ltd., including land in Colorado, for the bankruptcy estate's "release of property in A. Sam Coury's name for A. Sam Coury . . . ." In return, Coury, as an individual, assigned to Coury, Ltd. the profits of his dental practice during his lifetime up to $100,000. The agreement further provided that Coury, Ltd. "was not to own or ever take possession of any of the exchanged property . . . . nor was it to acquire any ownership rights, ownership, or any of the incidents of ownership in any of the exchanged property." On February 1, 1989, the bankruptcy trustee, on behalf of the bankruptcy estate, and Coury, Ltd. executed a "Contract of Exchange" whereby the bankruptcy estate traded its interest in Coury's CMI stock and other assets to Coury, Ltd. in exchange for Coury, Ltd. conveying to the bankruptcy estate certain described Colorado land.

On February 6, 1989, the bankruptcy trustee filed a notice of intent with the bankruptcy court to inform all creditors and interested parties of the transfers contemplated in the foregoing described "Contract of Exchange" and to give them an opportunity to file an objection. After being so notified, CMI, on March 14, 1989, filed an objection and offered a lesser bid limited only to Coury's CMI shares and interest in pending CMI-related litigation. The bankruptcy trustee informed CMI of his refusal to sell the CMI stock and litigious rights separately from the other assets involved and his intention to proceed to an in globo sale. On May 17, 1989, the bankruptcy court held a hearing, at which attorneys for CMI, Coury, and Coury, Ltd. appeared. After the hearing, the court

authorized the bankruptcy trustee to complete the proposed transaction or to accept any other bid in excess of $17,100 (the cash equivalent of the assets offered in exchange by Coury, Ltd.). CMI's attorney requested an opportunity to confer with her client, and the bankruptcy trustee agreed to hold the transaction open until 5:00 p.m., stating that he would then accept the highest bid for all of the property offered, including the CMI shares. CMI did not file any additional bid within the allotted time or anytime thereafter.[5] On May 19, 1989 the bankruptcy trustee, Coury, Ltd., and Coury entered into an "Addendum to Contract for Exchange" whereby, as additional consideration for the contract of exchange, Coury, Ltd. conveyed additional described real property in Colorado to the bankruptcy estate. Coury also conveyed to the bankruptcy estate an additional payment of $6,083.55. The final executed exchange of property and assets between the bankruptcy estate, Coury, Ltd., and Coury took place on June 7, 1989. Three days later, on June 10, 1989, Coury, Ltd. and Coury executed a document entitled, "Reaffirmation of Release and Redemption Agreement," which again made clear that "Coury, Ltd. in accordance with its December 23, 1988 agreement with A. Sam Coury, individually, hereby renounces, assigns, abandons, gives, and sets over, any interest it may have, ever had, or may have in any of the 14 items of property listed above [including Coury's CMI stock] to A. Sam Coury, individually for his sole benefit, use, and absolute ownership."

CMI did not contend during the bankruptcy proceedings in 1989 that the exchange of assets between the bankruptcy estate and Coury, Ltd. (for the benefit of Coury individually) amounted to a default by Coury upon his obligation not to

---

[5] The district court noted that "[f]urther, and of great importance, the record reflects that the Moss interests had the opportunity to purchase the stock from the Trustee and did not do so. . . . They can not now object to their own lack of action. Several Louisiana state courts have recognized Dr. Coury's full and proper ownership of the stock at issue and this Court does the same." We do not consider or address these additional reasons for the district court's ruling.

sell his stock to a third person without offering it to CMI for first refusal. Subsequently, in the extensive CMI-related state court litigation, however, Bill Moss, and later Sharon Moss, repeatedly sought unsuccessfully to use defensively the argument that Coury had forfeited his right of actions against CMI based on his defaulting on his obligation under Article X of the Articles of Incorporation. Despite the consistent rejection of this argument in slightly different forms and contexts by the state courts, after Coury filed this shareholder derivative action in federal court in 2006, the defendants moved to dismiss it on the ground that Coury is legally precluded from claiming to be a CMI shareholder because of his alleged default under Article X's first-refusal clause. Because the motion included evidence outside of the pleadings, the district court treated it as a motion for summary judgment. In response, Coury filed a motion for partial summary judgment seeking a judicial declaration that the defense raised in the motion to dismiss fails as a matter of law. The district court found that under the undisputed facts reflected by the record, Coury had not sold or transferred his stock to anyone so as to place himself in default of his obligation under the Articles of Incorporation. Accordingly, the district court rejected the defendants' motion to dismiss and granted Coury's motion for partial summary judgment striking that particular defense. For the reasons assigned earlier in this opinion, we permitted the defendants' interlocutory appeal from the partial summary judgment.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court: A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the facts in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor. See Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, the court must therefore "refrain from making credibility determinations or weighing the evidence." Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007).

## III. ANALYSIS

It is undisputed that Louisiana's substantive law governs our decision because Louisiana is the forum state in this diversity-based shareholder derivative action, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Erie R.R. v. Tompkins, 304 U.S. 64 (1938), and Louisiana's own law is the proper choice of law under the facts and its conflicts of law rules.[6]

Under Louisiana law, articles of incorporation are a contract between the corporation and its shareholders. Brennan's House of Printing, Inc. v. Brennan, 924 So. 2d 1067, 1072 (La. App. 5th Cir. 2006) (citing Odenwald v. Bewajobe Corp., 824 So. 2d 494 (La. App. 4th Cir. 2002)); Adler v. Hill, 981 F.2d 1474, 1485 (5th Cir. 1993). Thus, they are to be construed according to the rules found in

---

[6] Indeed, under Louisiana law, "an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue," which is determined by analyzing "(1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other." La. Civ. Code Ann. art. 3537. Here, although Coury is a resident of Oklahoma, all Defendants are either individual or corporate residents of Louisiana and the subject corporations have their principal places of business in Louisiana. Moreover, Coury, the only out-of-state resident involved in this suit, elected to file this shareholder derivative action in the United States District Court for the Western District of Louisiana. Based on the foregoing, we conclude that Louisiana's policies would be most seriously impaired if its laws were not applied to this case, especially given that this case involves an interpretation of Articles of Incorporation of a Louisiana corporation.

Book III, Title IV, Chapter 13, Interpretations of Contracts, of the Louisiana Civil Code. See Brennan's House, 924 So. 2d at 1072; Adler, 981 F.2d at 1485.

Under the Civil Code, contract interpretation "is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046. "The words of a contract must be given their generally prevailing meaning." La. Civ. Code Ann. art. 2047. In the present case, the words of Article X are clear and explicit insofar as they apply to the issue within the context of the undisputed facts. But this does not prohibit us from interpreting the contract in reference to laws on the same subject matter or taking notice of the purpose of the contract as a precaution against reaching absurd consequences.[7]

Under the Civil Code, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." See La. Civ. Code Ann. art. 1906.[8] "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or of not doing something." See La. Civ. Code Ann. art. 1756. "Obligations arise from contracts and other declarations of will." See La. Civ. Code Ann. art. 1757. "An obligation may give the obligee the right to: (1) Enforce the performance that the obligor is bound to render; (2) Enforce performance by causing it to be rendered by another at the obligor's

---

[7] See La. Civ. Code Ann. art. 2046 cmts. (a) & (c).

[8] "A contract is bilateral, or synallagmatic, when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other." See La. Civ. Code Art. 1908. "A contract is commutative when the performance of the obligation of each party is correlative to the performance of the other." See La. Civ. Code Art. 1911.

expense; [or] (3) Recover damages for the obligor's failure to perform, or his defective or delayed performance." See La. Civ. Code Ann. art. 1758.

In the present case, the share transfer restriction contained in Article X is a contract that creates obligations whereby each shareholder is bound to render a performance to the corporation and the other shareholders. That performance consists either of (1) not selling any share of stock to a third person, or (2) first offering to sell it to the corporation at book value before selling it to a third person.[9] Accordingly, Article X essentially creates an obligation "not to do" (not to sell a share to a third person without offering first refusal at book value to the corporation), but which may be viewed as also including an obligation "to do" (to offer the corporation first refusal at book value before selling it to a third person).

Because no one may avail himself of ignorance of the law, see La. Civ. Code Ann. art. 5, Coury and Bill Moss, and their heirs and assigns, must be presumed to have agreed to be bound by Article X according to the meaning of its terms as provided for by law. Therefore, in order to determine whether Coury defaulted on his obligation not to sell his shares without first offering them to CMI, we must refer to the Civil Code Articles pertaining to the contract of sale, ownership, and transfer.

---

[9] "In most close corporations, some agreement among shareholders concerning the transfer or sale of shares is desirable, if not of vital importance to the participants in the business." 7 Glenn G. Morris & Wendell H. Holmes, La. Civil Law Treatise (Business Organizations) § 29.01, at 681 (1999). Indeed, such restrictions "typically serve as an important device to ensure that current shareholders can control the ownership and management of the corporation and prevent outsiders from invading the business." 12 Jennifer L. Berger & Carol A. Jones, Fletcher Cyclopedia of the Law of Private Corporations § 5454, at 117-18 (2004); see also Martin v. McCloskey, 99 So. 477, 480 (La. 1924); Crescent City Seltzer & Mineral Water Mfg. v. Deblieux, 3 So. 726, 727 (La. 1888); Adler, 981 F.2d at 1479 ("This type of restriction has long been recognized as serving valid purposes in closely-held corporations, principal among which are 1) controlling the makeup of the shareholder group, and 2) preventing the stock from falling into the hands of undesirable corporate partners.").

The term "sale" under Louisiana law is defined as "a contract whereby a person transfers ownership of a thing to another for a price in money." La. Civ. Code Ann. art. 2439 (emphasis added). "The thing, the price, and the consent of the parties are requirements for the perfection of a sale." Id. Article 2443 explicitly confirms that which is implicit in Article 2439 by making it plain that "[a] person cannot purchase a thing he already owns." See also Otwell v. Vaughan, 173 So. 527, 534-35 (La. 1937); Scott v. Leonard, 30 So. 841, 841 (La. 1901). However, Article 2443 adds: "Nevertheless, the owner of a thing may purchase the rights of a person who has, or may have, an adverse claim to the thing."

Applying the foregoing Civil Code Articles to the present case, we conclude that Coury did not default on his obligation under Article X. The only performance Coury was bound to render under Article X was not to sell his shares, i.e., transfer ownership of his CMI shares to a third person, without first offering them to CMI at book value. He fully performed his obligation by not selling or transferring ownership of his shares to anyone. Thus, he never became bound to render the alternate performance of offering them to CMI at book value. Consequently, based on the record in this case, CMI does not have the right to enforce performance of any kind by Coury or to deprive him of his right as the owner of his shares to bring a shareholder derivative suit.[10]

Defendants' arguments to the contrary are without merit.

First, Defendants baldly assert that Coury is estopped to bring this action because his shares were twice transferred in violation of Article X; and that he

---

[10] Defendants cannot enforce Coury's performance of his obligation not to sell his stock to a third person because Coury has performed and continues to perform this obligation by maintaining his ownership of his stock. Concomitantly, Defendants cannot enforce Coury's performance of offering his shares to CMI at book value because he never became bound to do so, since he did not sell his stock to a third person. Thus, Defendants cannot recover any damages from Coury because Coury simply has not defaulted on any obligation owed to CMI.

holds them only because he continues to breach his obligation to transfer those shares to CMI as required by Article X. However, in this argument, Defendants do not point to any specific evidence in the record showing that Coury sold or transferred his CMI shares to anyone. In the absence of such proof, defendants fail to demonstrate that Coury defaulted on his Article X obligation or that Coury became bound to transfer his shares to CMI. To the contrary, this court, the district court, and a number of state judges have reviewed the factual history of this case and have found no evidence to support a finding that Coury ever sold or transferred the ownership of his CMI shares to a third person so as to place himself in default or to require that he offer his stock to CMI.

As legal support for their estoppel argument, Defendants cite only the following Louisiana cases: Morris v. Friedman, 663 So. 2d 19, 25 (La. 1995); Coker v. Supreme Indus. Life Ins. Co., Inc., 43 So. 2d 556, 558 (La. App. 1950); Eves v. Morgan City Fund, 252 So. 2d 770, 775 (La. App. 1st Cir. 1971); Humble Oil & Refining Co. v. Boudoin, 154 So. 2d 239, 249-50 (La. App. 3d Cir. 1963); Phillips v. Mid-Continent Life Ins. Co., 130 So. 2d 791, 798 (La. App. 2d Cir. 1961). These cases are inapposite to the present case. Defendants present no argument to explain how these cases constitute authority for their bare assertion that Coury is estopped to bring this litigation. Consequently, we conclude that Defendants have abandoned their estoppel position because of inadequate briefing and lack of argument. See Nichols v. Enterasys Networks, Inc., 495 F.3d 185, 190 (5th Cir. 2007) ("Where analysis is so deficient, this court has considered the issue waived for inadequate briefing.").

Defendants also devote a major part of their brief to an argument that the exchange of assets between the bankruptcy estate, Coury, Ltd., and Coury was a

sale, not an exchange.[11] We pretermit resolution of this issue as being irrelevant to our decision. Regardless of whether the transfer between the bankruptcy estate and Coury, Ltd. was a sale or an exchange, it was not a transfer by Coury of his CMI shares to a third person in default of his obligation under Article X.

Finally, Defendants assert that the transaction between Coury, Ltd. and Coury was a sale that triggered CMI's Article X right to compel Coury to sell his shares for book value. However, Defendants make no cogent argument in support of their assertion. Instead, they mischaracterize the district court's decision as being based solely on Coury's physical possession of the certificates representing his shares of CMI stock; then they proceed to demonstrate that possession of stock certificates is not necessarily legally determinative of stock ownership. But, that was not the rationale of the district court's decision. The district court found, as we do in our de novo review, that Coury did not default on his obligation and is not bound to render any performance under Article X to CMI because Coury never sold or transferred his ownership of his CMI shares to anyone.

The transaction between Coury, Ltd. and Coury could not possibly have constituted a default by Coury on his obligation to CMI under Article X not to sell his CMI shares to a third person without first offering it to CMI for first refusal. Coury did not sell or transfer his stock at all in that transaction; instead, he merely received, as third-party beneficiary,[12] a release or discharge of the bankruptcy estate's interest or adverse claim in his CMI stock. The only thing Coury transferred or gave up was his assignment to Coury, Ltd. of his future dental practice profits for life up to $100,000. Furthermore, although the final executed exchange transferred the bankruptcy estate's interest in the CMI shares

---

[11] Article 2660 defines an "exchange" as "a contract, by which the parties to the contract give to one another, one thing for another, whatever it be, except money; for in that case it would be a sale." See La. Civ. Code Ann. art. 2660.

[12] See La. Civ. Code Ann. arts. 1978-1982.

to both Coury and Coury, Ltd., the two Coury parties agreed in writing before (and again after) executing the Contract of Exchange that the entire transaction was solely for the benefit of Coury and that Coury, Ltd. would receive no interest in the ownership of the CMI stock. Consequently, instead of making a "sale" of his CMI shares, as that term is defined in Article 2439, Coury was the third party beneficiary of the inverse of a sale, viz., the purchase of rights of a person (the bankruptcy estate) which had, or may have had, an adverse claim to a thing (the CMI shares) under Article 2443.

## IV. CONCLUSION

Because the undisputed facts of record in this case, consisting principally of documentary evidence, demonstrate that Coury has not sold or transferred his CMI stock to anyone and therefore has not defaulted on his obligation under the Article X first refusal clause, Defendants do not have the right to require Coury to sell his stock to CMI at book value or to prevent him from exercising his right of ownership as a stockholder to bring this shareholder derivative action.

For these reasons, we affirm the partial summary judgment of the district court.

AFFIRMED.